UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA

v.

Honorable Cathy L. Waldor, U.S.M.J.
Mag./Case No. 18-7094 (CLW)

STEVEN BRADLEY MELL
a/k/a BRADLEY MELL

Defendant.

---

## MEMORANDUM SUPPORTING THE
## RELEASE OF DEFENDANT PENDING TRIAL

---

The Bianchi Law Group, LLC
4 York Ave., 2nd Fl.
West Caldwell, NJ 07006
Tel.: (862) 210-8570
Fax.: (862) 210-8761
*Attorneys for Defendant*

## TABLE OF CONTENTS

Page

LEGAL ARGUMENT ....................................................................................................... 1

DEFENDANT HAS OVERCOME THE REBUTTABLE PRESUMPTION
OF DETENTION AND SHOULD BE RELEASED PENDING TRIAL ........................... 1

A.      NATURE   AND   CIRCUMSTANCES   OF   THE   OFFENSE
CHARGED......................................................................................................... 3

B.      WEIGHT OF EVIDENCE AGAINST DEFENDANT................................. 5

C.      HISTORY AND CHARACTERISTICS OF DEFENDANT .................... 6

(1)     LIFETIME   CONTACTS   AND   CHARITABLE
FOUNDATION ........................................................................... 10

(2)     MR. MELL'S FAMILY AND EMPLOYEES DEPEND ON
HIS FINANCIAL SUPPORT...................................................... 12

(3)     NOT A FLIGHT RISK: MR. MELL CONTACTED A
LAWYER AND OFFERED TO TURN HIMSELF IN ........... 13

(4)     NOT A FLIGHT RISK: MR. MELL'S MEDICAL NEEDS
WERE DOCUMENTED FOR THE JAIL ................................ 14

(5)     NOT   A   FLIGHT   RISK:   MR.   MELL   RETURNED   TO
THE    JURISDICTION    AFTER    INTERNATIONAL
VACATIONS ................................................................................ 14

(6)     NOT A FLIGHT RISK: MR. MELL NO LONGER HAS
ACCESS TO PLANES AND HELICOPTERS ......................... 15

(7)     THE PRETRIAL SERVICES INTERVIEW ............................. 16

(8)     PRETRIAL   SERVICES   RISK   ASSESSMENT   AND
RELEASE REPORT .................................................................... 17

D.      NATURE AND SERIOUSNESS OF DANGER POSED BY
DEFENDANT'S RELEASE............................................................................ 22

CONCLUSION AND PROPOSED BAIL PACKAGE......................................................... 22

**LEGAL ARGUMENT**

## DEFENDANT HAS OVERCOME THE REBUTTABLE PRESUMPTION OF DETENTION AND SHOULD BE RELEASED PENDING TRIAL.

A defendant's right to bail is addressed in the Bail Reform Act of 1984 (18 *U.S.C.* §§ 3141, et seq.). Generally, a defendant must be released on bail on the least restrictive condition or combination of conditions that will reasonably assure the defendant's appearance and the safety of the community. 18 *U.S.C.* § 3142(c)(B). Pursuant to 18 *U.S.C.* § 3142(e), however, if after a detention hearing a court determines that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community" the court must Order the detention of the person before trial.

If the government or court believes detention is appropriate because there is a risk of flight, this must be proved by a preponderance of the evidence. *United States v. Himler,* 797 F.2d 156, 161 (3d Cir. 1986).

If the government moves for detention on the basis of danger to the community, it must prove this by clear and convincing evidence. 18 *U.S.C.* § 3142(f). The government may move for detention on the basis of danger to the community only for an offense that is listed in 18 U.S.C. § 3142(f)(1)(A) to (E). *United States v. Abdullahu,* 488 F. Supp. 2d 433, 437-38 (D.N.J. 2007).

In this case, Mr. Mell is charged with a rebuttable presumption offense under 18 *U.S.C.* §§ 2422, 2423 (felonies involving an alleged minor victim). Pursuant to 18 *U.S.C.* § 3142(e), if the Court first finds there is probable cause to believe the defendant committed the offenses

1

charged, there is a rebuttable presumption "that no condition or combination of conditions will reasonably assure the appearance of the person . . . and the safety of the community."

If a rebuttable presumption applies, the defendant carries the burden of production to come forward with evidence to rebut the presumption. *United States v. Perry,* 788 F.2d 100, 114 (3d Cir. 1986). However, the defendant's obligation to come forward with evidence does not shift the burden of persuasion to the defendant. *Id.* The government must still prove by preponderance of the evidence that Mr. Mell is a flight risk, *Himler,* 797 F.2d 161, or by clear and convincing evidence that Mr. Mell is a danger to himself or the community. 18 *U.S.C.* § 3142(f).

In producing evidence to rebut the presumption, Mr. Mell looks to the four factors which the Court must consider in determining whether pretrial detention is warranted:

> (1) the nature and seriousness of the offense charged;
>
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person, including-- (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
>
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

[18 *U.S.C.* § 3142(g)]

2

A.      **Nature and Circumstances of the Offense Charged.**

Mr. Mell is charged in Counts One through Three of the complaint with "Online Enticement of a Minor" in violation of 18 *U.S.C.* § 2422(b), and in Court Four with "Travel with the Intent to Engage in Illicit Sexual Conduct" in violation of in violation of 18 *U.S.C.* § 2423.

Under § 2422(b), a defendant may be prosecuted for "using the mail or any facility of interstate or foreign commerce" to "knowingly persuade[ ], induce[ ], entice[ ], or coerce[ ] an individual who has not attained the age of 18 years, to engage in prostitution or any sexual activity for which any person can be charged with a criminal offense, or attempt[ing] to do so." 18 *U.S.C.* § 2422(b). A conviction under § 2422(b) carries a mandatory minimum sentence of 10 years and a maximum penalty of life. *Id.*

Subsection (b), originally added to § 2422 in 1996, was amended two years later as part of the Child Protection and Sexual Predator Punishment Act of 1998. The bill that was described as "a comprehensive response to the horrifying menace of sex crimes against children, particularly assaults facilitated by computers." H.R. Rep. No. 105-557, at 10 (1998). The bill's legislative history reflects Congress's concern with cyber-predators interacting with minors online and its goal of addressing computer-related crimes against children. *Id.*

Congress emphasized the dangers posed by cyber-predators developing online relationships with minors, noting that "'cyber-predators' often **'cruise' the Internet** in search of lonely, rebellious or trusting young people. The **anonymous** nature of the on-line relationship allows users to misrepresent their age, gender, or interests. Perfect strangers can reach into the home and befriend a child." *Id.* at 11-12 (emphasis added). Congress highlighted the potential consequences of allowing cyber-relationships between predators and minors:

> Recent, highly publicized news accounts in which pedophiles have **used the Internet to seduce or persuade children to meet them** to engage in sexual activities have sparked vigorous debate about the wonders and perils of the information superhighway. Youths who have agreed to such meetings have been kidnapped, photographed for child pornography, raped, beaten, robbed, and worse.

> [*Id.* at 12 (emphasis added)]

Members of the House emphasized that the aim of the Protection Act was to punish "pedophiles who stalk children on the Internet." *Id.* at 12. During a debate, Representative Bill McCollum, stated:

> The key portion of this bill, and there are a lot of other things in it, is to make sure when there is contact made over the Internet **for the first** time by a predator like this with a child, with the intent to engage in sexual activity, whatever that contact is, as long as the intent is there to engage in that activity, he can be prosecuted for a crime.

> [144 Cong. Rec. H4497 (daily ed. June 11, 1998) (statement of Rep. McCollum) (emphasis added)]

Echoing Representative McCollum's sentiments, Representative Sheila Jackson-Lee stated that the Protection Act "would be a start to effectively prevent a predator from **initiating** a harmful relationship with a child from illegal sexual activity and to subjecting children to damaging pornographic material that our children can currently access." *Id.* at 4493 (statement of Rep. Jackson-Lee) (emphasis added).

As the legislative history demonstrates, Subsection (b) is meant to combat use of the internet to anonymously lure children into sexual encounters. This is not the circumstance alleged here. According to the complaint, Mr. Mell already had a pre-existing relationship with the minor when he allegedly began communicating with her through telephone, text message,

4

and SnapChat in May 2017.  In fact, it was the minor's mother who first introduced Mr. Mell to obtain flight lessons for the minor.

At worst, therefore, Mr. Mell and the minor allegedly communicated about a relationship that was already in existence.  There are no allegations to suggest Mr. Mell was "cruising" the internet in search of underage victims- which is what the statute was enacted to prevent.  H.R. Rep. No. 105-557, at 11-12 (1998).

Moreover, the preeminent characteristic of the conduct prohibited under § 2422(b) is transforming or overcoming the minor's will, whether through "inducement," "persuasion," "enticement," or "coercion."  *United States v. Hite*, 769 F.3d 1154, 1161 (D.C. Cir. 2014); *see FDIC v. Meyer*, 510 U.S. 471, 476 (1994) (Congress is presumed to use words in the common, ordinary meaning absent contrary indication).  Here, while the communications are alleged to be sexually charged, there is no allegation that Mr. Mell exerted effort to transform or overcome the minor's will.  Simply discussing sexual activity with a minor does not equal an effort to transform or overcome the minor's will.

**B.      Weight of Evidence Against Defendant.**

The government alleges to have a series of electronic communications between Mr. Mell and the minor.  None of these communications, however, demonstrate any effort by Mr. Mell to transform or overcome the minor's will.  Moreover, we believe the allegations set forth in the complaint demonstrate a misapplication of 18 *U.S.C.* § 2422(b).  As explained above, Congress enacted § 2422(b) to curb anonymous trolling of the internet for underage victims.  Here, Mr. Mell already had an established relationship with the minor which began when the minor's mother introduced her to Mr. Mell.

5

**C.**     **History and Characteristics of Defendant.**

Mr. Mell was born on December 15, 1965 at Morristown Memorial Hospital in New Jersey. He has two siblings, Courtney and William, who are 54 and 55 respectively. His mother, Diana age 81, thankfully is still alive in South Carolina; and his father, William Harvey, passed away in December of 2008.

Mr. Mell was raised in a loving and compassionate family. He demonstrated to them early on that he has the drive and focus to succeed, and that he is determined to dedicate all his time and energy to his family, his charity, work, his employees, and his hobbies. Indeed, it is his care and compassion for others that has impacted the lives of so many people, as stated by his mother, Diana Mell.

> Since he was a young boy, he has always been a hard worker with integrity and determination to not only succeed at a job, but to do it the right way. He has carried this through into adulthood where along the way he has made many friends and has earned the respect of individuals and industry professionals!

> [Exhibit "A" (Letter from Diana Mell, dated May 22, 2018)]

Mr. Mell's academic career began in New Jersey at Far Hills day school from K-9th grade, Tilton Prep School in New Hampshire for High School, and Boston University for college where he graduated in 1988 with a major in psychology.

Early on, Mr. Mell struggled in school barely making C's and D's. Fortunately, Headmasters of Far Hills Day School, Russ Ball and Chuck Scranton, recognized Mr. Mell was suffering from dyslexia. He was diagnosed with an extreme case of dyslexia, which he worked tirelessly to overcome. It paid off. In seventh-grade, Mr. Mell went from C's and D's to an improvement so drastic that he received the Headmaster's Award.

After attending Far Hills Day School, he enjoyed the opportunity to attend Tilton Prep School in New Hampshire.  He excelled at Tilton, participating in three sports including the varsity hockey team.  Along with his performance as an athlete and scholar, he also found time to participate in theater and in his senior year he was honored with the Theater Award for his work on the productions of the school's plays.

As a teen, Mr. Mell became passionate about flying.  His desire to always put his focus and energy into everything he did was never more apparent than his love for flying.  He received his pilot's license at the age of 16, and in 2008, he received his fixed wing and helicopter rating.  His love of flying, along with the peace, serenity, and joy he got from being in the air became the source of his greatest memories.

In 1984, Mr. Mell moved to Boston where he attended college at Boston University. Mr. Mell was always actively looking to serve, so in 1987 he became an auxiliary police officer in Boston.  In 1988, Mr. Mell graduated college with a M.A. in Psychology.  During the next few years, Mr. Mell worked as a trader for the State Street Bank in Boston and began to develop a talent for finance.  It was also during this time that he found his greatest love- Kimberly Ruggles, whom he married in 1992.

Mr. Mell and his wife moved back to New Jersey, where Mr. Mell began his new career with his father at W.H. Mell Associates.  He started out as a municipal broker dealer making less than $20,000 per year.  He hoped that he would be able to grow W.H. Mell Associates into the business through his tireless work and aptitude.  But Mr. Mell being who he is did not just grow into the business; he helped transform the company from the ground up.  In 1996, Mr. Mell took over as company President, a position he maintains through today.  As President of W.H. Mell,

7

Mr. Mell is responsible for the continued employment and support of over 15 associates and their families. His employees have always been like family to Mr. Mell, and he has continued to grow the business of the firm to staggering heights.

Gratefully, it was during this time that Mr. Mell also built his life as a proud family man. Mr. Mell's first daughter, Emily, was born in 1996. She graduated from Bucknell University with a degree in education the weekend after his arrest. Mr. Mell was forced to miss the graduation due to his detention which will be a regret until the day he dies. In 1998, Mr. Mell's second daughter, Eliza, was born. She is now attending Colby College as a pre-med veterinary student. And, in 2003, Mr. Mell's son, William, was born. He is a high school student at Westminster School in Connecticut.

Mr. Mell loves and is proud of all his children. Even while running an organization of multiple companies, Mr. Mell always had time for his children. He has been integral in the education of his children, constantly being present and active for every event, play, graduation, conference and game. Mr. Mell became an active member of school boards and hockey teams. He enjoyed three years with Eliza taking her around the country playing travel hockey with the Colonials. He was a coach of the hockey team for over 10 years at the Essex Hunt Club. And for 15 years, Mr. Mell served as a board member at Westminster School, the last two years of which he also served as Chair of the Investment Committee. Incredibly, Mr. Mell also devoted time and service on the Far Hills Day School board for 10 years as a way to give back to the school that helped him overcome his extreme dyslexia. He served for over 10 years as the Chairman for Building and Grounds. In 2017, Mr. Mell was celebrated with a special dedication

for his work during his 10-year volunteer service to the school.  Michael Simon Scott, best man and friend for almost 50 years, recalls the event.

> In May of 2017 I attended an event that Far Hills Country Day School sponsored solely to honor Brad, it was not I should emphasize, to simply thank him for some outsized financial gift, it was however to present him with what they called the "The Unsung Hero Award."  This newly created award inspired by Brad's actions was Far Hills Country Day School's way of not allowing all that Brad had done for the school to go unrecognized.
>
> [Exhibit "B" (Letter from Michael Simon Scott dated May 28, 2018)]

Life seemed to be going great for Mr. Mell.  He had a wonderful family, a successful business, and an active community life. It seemed that nothing could ever go wrong.  Until October 1, 2011: Mr. Mell was scheduled to attend a golf outing with friend Will Ellsworth, and two others in New York.  Will, who he considered his best friend, planned to travel via helicopter to the Pine Valley Golf Club and return the same evening.  But it was a last-minute work circumstance that caused Mr. Mell to back out of the trip and ask his friend Tighe Sullivan to take his place.

Tragically, Will Ellsworth and Tighe Sullivan while traveling in one of Mr. Mell's helicopters crashed the very same day just outside of Mount Pocono, both his friends died in the crash.  The survivor's guilt sent Mr. Mell into a spiral of depression.  He was burdened with the thought of their families and guilt for the suffering his own family avoided.

Mr. Mell sought the help of a therapist.  Coping with the loss of friends- one of whom took his place on that helicopter- has been an arduous process.  But, it was in therapy that Mr. Mell was able to see how much he was doing for so many people, and how the burden of his responsibility to so many people was taking its toll on him emotionally.  He had supported his

9

father and mother through his father's alcoholism and continued to pay all the bills for his parents as well as some of his siblings. His responsibility to his family was enormous, and Mr. Mell never balked at the opportunity to give to so many.

While Mr. Mell helped to build a successful business, organized numerous charitable programs, and achieved numerous awards as a student, coach, board member and businessman, he prefers not to live in the spotlight but rather to let his actions as a husband, father, business owner, and volunteer be the story of his life. As a humble man, Mr. Mell doesn't announce the accolades he has received in his lifetime. Instead, his family and friends proudly proclaim the impact Mr. Mell's actions and service has had on all of them.

Mr. Mell is not only generous with his family and his employees, but he knows that providing and caring for others who are not as fortunate as himself is vital to the community. William, his brother, writes about the selfless philanthropic nature of his brother.

> [D]espite his success, he spends more time giving than taking while taking drastic steps to keeps his actions as low key and private as possible as he is not looking for attention. One great example of this is that Brad does Air Lifeline which is now known as Angel Life flights for people that need better medical care in a different part of the county so he either flies them himself to wherever or, at this own expense, has a pilot use his plane to get the patient to wherever they need to go.

[Exhibit "C" (Letter from William Mell, dated May 23, 2018)]

Lifetime Contacts and Charitable Foundation.

Mr. Mell has a lifetime of contacts in the New Jersey area, many of whom are well-respected professionals. He has always been well known in the community as an upstanding professional holding several licenses in finance, including his series 63, 7, 52, 24 and 53. He is

longstanding board member on the Essex Hunt Club, Tilton Prep School, Somerset Hills Country Club and was a member Far Hills Day School Board from 2004-2014.

Mr. Mell has started his own charitable foundation, Air Lifeline (merged with Angel Flights in 2009), that has donated to families of children with medical needs, the ability to fly anywhere in the country in order to received medical treatment.

Mr. Mell is a donor to the Mooreland Foundation, Morristown Memorial Hospital, NJ Visiting Nurse Association, Far Hills Day School, Westminster School, Red Cross, and Brady Life Camp (a Newark inner-city kids camp). He has given to countless other charities choosing to remain anonymous in his generosity.

Mr. Mell's incredible generosity and love for his friends shines through in a letter from Perry Hall, a friend of Mr. Mell's since childhood:

> My father died in July 2012 and we planned the funeral shortly thereafter. It was in the middle of summer and many of my friends were on vacation and busy with their own young families. Entirely on his own, Mr. Mell arranged to fly about 8 of my closest friends to attend the service and return them back to their own families the same day so as not to disrupt family vacations. While Mr. Mell knows these folks through mutual friends, these were my closest college friends – not his. He knew how much the effort would mean to me at a very difficult time. He didn't ask anyone to help pay and wasn't doing it for any kind of personal gain, but rather because he knew how great it would be for me to have such a strong support network.

> [Exhibit "D" (Letter from Perry Hall, dated May 24, 2018)]

Along with the support of his friends, Mr. Mell is anchored by the love and support of his family whose addresses are listed as follows:

Peter Courtney Mell (Brother) (54)
PO Box 2012
Palm Beach, FL 33480

11

Diana D. Mell (Mother) (81)
72 Fletcher Hall
Kiawah, SC 29455

William Harvey Mell III (55)
13 School St
Hopkinton, MA 01748

     Mr. Mell has led of life free from criminal prosecution and is considered by his friends and family as an asset to his community. Mr. Mell has consistently demonstrated throughout his life his accountability and integrity to his family, his business, his employees, his clients, and the community. His invitation to sit on multiple school boards, local clubs and organizations, along with his 25-year stellar track record with his clients further shows that he is a man who is trusted by many respected members of our community.

    <u>Mr. Mell's Family and Employees Depend on His Financial Support.</u>

     As the president of W.H. Mell, Mr. Mell is responsible for the continued employment of over 15 associates and their families. His employees have always been like family to Mr. Mell, and he has continued to grow the business of the firm to staggering heights. It is only with access to his business that he can keep the business running, ensuring that his employees and their families are provided for during the ongoing litigation.

     Moreover, Mr. Mell's own family relies on the support that his income provides, and interruption would be an undue burden on his family. In a letter to Pretrial services, through Kimberly Mell's attorney, Ceconi and Cheifetz, concern for the financial well-being of the family is addressed:

        . . . Mr. Mell provides the financial support for our client's household, including three children. He does so through W.H. Mell, Inc, a business he owns and operates. Ms. Mell is concerned

12

that if Mr. Mell is not available to operate the business because he is detained, he will be unable to support the family.

[Exhibit "E" (Correspondence from Ceconi and Cheifetz, dated May 25, 2018)]

Furthermore, it is with the unwavering support of his family that we ask for Mr. Mell's release on bail. Mrs. Mell has made it clear that despite her recent filing for divorce, she "is supportive of Mr. Mell's release on bail." Exhibit "E" (Correspondence from Ceconi and Cheifetz dated May 25, 2018).

Not a Flight Risk: Mr. Mell Contacted a Lawyer and Offered to Turn Himself In.

Mr. Mell was first made aware in December 2017 of this criminal investigation against him that was initiated by the Hunderton County Prosecutor's Office. At that point, Mr. Mell contacted Marcy McMann, Esq., a criminal defense attorney in Morristown, New Jersey.

Mr. Mell did not flee or leave the jurisdiction. Instead, he hired counsel to represent his interests in the criminal investigation and hired counsel to handle demands for money made by the alleged victim's family.

On December 28, 2017, Ms. McMann sent correspondence to Assistant Prosecutor Kelly Daniels at the Hunterdon County Prosecutor's Office to advise the prosecutor's office of her representation and relaying Mr. Mell's offer to cooperate and surrender if any criminal charges were to be filed against him. Exhibit "F" (Correspondence from Marcy McMann, Esq. dated December 28, 2017). From that time until his arrest, Mr. Mell had ample opportunity to flee the jurisdiction if that was his intention. Rather, he was preparing to submit to the jurisdiction of the court. The defendant believes this is a very telling fact when considering risk for flight.

13

<u>Not a Flight Risk: Mr. Mell's Medical Needs Were Documented for the Jail.</u>

On February 26, 2018, during the pendency of the criminal investigation, Mr. Mell secured a letter from his doctor, Arthur Scott Campbell, M.S., M.D, in anticipation of being arrested.  In the letter, Dr. Campbell writes about his long history with Mr. Mell as well as his treatment for depression and anxiety.  The letter states:

> He informed me almost three months ago about potential legal issues, and I have been seeing him for these past three months, because of the stress and anxiety associated with his potential legal issues. . . . He has recently informed me that in fact that he will be incarcerated for at least two days in the near future.  He must not abruptly discontinue these medications while incarcerated, as to do so could trigger seizures and death.

[Exhibit "G" (Letter from Dr. Campbell, dated Feb. 26, 2018)]

Mr. Mell is not a person who intends to and/or has the pre-disposition to flee from his problems.  Uniquely, he was actually having his physician prepare the jail for his arrival, not the actions of a person who presents a flight risk. His actions during the pendency of the criminal investigation not only demonstrate accountability and responsibility, but also go well beyond good faith already demonstrated to this Court with evidence of his submitting to arrest that rarely is shown in cases.

<u>Not a Flight Risk: Mr. Mell Returned to the Jurisdiction after International Vacations.</u>

Perhaps more telling, is the fact that during the time that Mr. Mell had knowledge of the criminal investigation and impending arrest, Mr. Mell took two international vacations with his children to the Dominican Republic and the Bahamas.

In early March 2018, Mr. Mell traveled with his son, William, and daughter, Emily, enjoying a week in the Dominican Republic for their spring break. In late March 2018, Mr. Mell took his daughter, Eliza, and her friend for a week on the island of Nassau in the Bahamas.

Each time, Mr. Mell returned to New Jersey, and it was not until May 9, 2018 that Mr. Mell was formerly charged by the United States Attorney's Office. Again, his opportunity to flee the impending arrest was ample, and he did not.

   Not a Flight Risk: Mr. Mell No Longer Has Access to Planes and Helicopters.

Mr. Mell and his wife have two aviation companies, Aero Care One, LLC and WNFW, LLC, that own 2 airplanes and 1 helicopter. The airplane company is called Aero Care One, LLC and is 99% owned by a family trust for the benefit of the three Mell Children. Ms. Mell has 1% ownership of the company and is the designated trustee of the company. Aero Care One, LLC has no employees and Ms. Mell has already sent a letter to Pretrial Services advising that as trustee, she agrees not to allow Mr. Mell to have access or use the planes/helicopter if he is released on bail. Exhibit "E" (Letter from Ceconi and Cheifetz, dated May 25, 2018).

Additionally, Mr. Mell has taken proactive steps to secure the planes and eliminate his access to them to alleviate any concerns the Court has that the planes may be used to flee. The King Air Beechcraft B200, located at the Somerset County Airport, is stored in a hangar and the locks on the hangar have already been changed subsequent to his arrest and with his full support and permission. Mr. Mell agrees to turn over any keys in his possession. Additionally, Mr. Mell himself executed a memorandum of understanding which was directed to the Somerset County Airport which states that he agrees not to access or use any hangar or aircraft at the Somerset County Airport including but not limited to a 1981 Beech King Air. Exhibit "H" (Somerset

County Airport Agreement dated May 27, 2018). These are not the actions of a man intent of fleeing the court's jurisdiction.

The second plane, a Hawker XP800, is stored in Pennsylvania. This plane has been grounded for unpaid bills, and it also requires a charter as well as an FAA flight plan before it can be flown. Moreover, Mr. Mell lacks the rating and ability to fly this particular aircraft.

The helicopter is owned by WFNW, LLC which is a leasing company, through which Mr. Mell purchased the helicopter. The helicopter is leased by Platinum Helicopters, LLC and has been used as a charter helicopter for executive travel. It is stored by Evan Van Gilson who is a friend of Mr. Mell's as well as a former law enforcement officer. In preparation of today's detention hearing, the keys to the Hangar have been changed, and Evan Van Gilson agrees not to provide access to Mr. Mell. Mr. Mell agrees to turn over any keys he has.

Finally, Mr. Mell agrees to forfeit his pilot's license as a condition of bail.

The Pretrial Services Interview.

Shortly after his arrest on May 9th, Mr. Mell had an interview with U.S. Pretrial Services Officer David E. Hernandez. At the onset, May 9th was an emotional and traumatizing day for Mr. Mell. Mr. Mell is a successful professional without a criminal history. On that day, agents from the Federal Bureau of Investigations and other law enforcement officers executed a search warrant at his residence and arrested him. The events of the day left Mr. Mell in shock and further exacerbated the depression and anxiety that he had been dealing with since the death of his friends.

While pre-trial services interviews are a routine after Defendants are arrested on federal charges, the day and effects of the day were far from routine for Mr. Mell. Mr. Mell did not

deceive, nor was it his intention to deceive Mr. Hernandez. Instead, the trauma and anxiety of being placed in jail for the first time in his life may have caused an understandable lapse in understanding and recollection of everything asked of him by Mr. Hernandez.

Additionally, Mr. Mell has an extremely complex financial situation which includes multiple businesses and complicated trusts that are applicable to most of Mr. Mell and his family's assets. The management of Mr. Mell's assets require accountants and lawyers to understand. And, while it may appear that Mr. Mell may have a substantial amount of assets, most assets are held in irrevocable trusts for the sole benefit of his three children.

We respectfully ask these factors be considered when assessing whether Mr. Mell was truthful or had an intention to deceive Mr. Hernandez.

<u>Pretrial Services Risk Assessment and Release Report.</u>

Defense counsel had an opportunity to meet with Mr. Hernandez and review his Risk Assessment and Release Report. Mr. Hernandez documents several concerns after speaking with Mr. Mell's wife, Kimberly Mell, and/or comparing the Mr. Mell's answers to other documents or known facts. Specifically, Mr. Hernandez notes the following:

- Mr. Mell failed to disclose an application for a duplicate firearms ID card and application for 2 handguns filed at the Bedminster Police Department on May 8, 2018;

- Mr. Mell failed to acknowledge a mental health history and that he was taking medications at the time of his arrest;

- Mr. Mell failed to identify a business that he owns, namely, Gulfstream CM, LLC.

*Firearm's Identification Card and Handgun Permit.*

On May 8, 2018, one day prior to his arrest (though the date of his arrest was unknown by Mr. Mell at the time), Mr. Mell filled out a request for a duplicate Firearms

Purchaser Identification Card.   Additionally, on the same form, Mr. Mell applied for two handguns.  Mr. Mell submits that these applications were not to harm himself or others.  Instead, the intention for the applications was for the protection of himself, his family, and the family's dogs from coyotes and other wildlife recently seen on his property. This claim on its face could certainly be interpreted as suspicious.  But, it is in fact provable.

To further evidence his purpose in securing the firearms permit, our firm employed the service of Daniel Coleman to take statements from witnesses that communicated with Mr. Mell about the purpose of the above-mentioned applications. Mr. Coleman worked as a detective supervisor at the Morris County Prosecutor's Office when I served as the Morris County Prosecutor from 2007 through 2013. He now owns a private investigation company.

In one statement, Alan Fournier, a friend and neighbor of Mr. Mell, recalled a text conversation that he had with Mr. Mell about Mr. Mell's "coyote problem." Mr. Coleman's report of the interview states;

> Mr. Fournier showed me his cell phone and the text message exchange he had with Mr. Mell. (Images of the text message conversation are at the bottom of this report.) The conversation began on Sunday, April 29, 2018 at 7:59 PM, when they were scheduled to get together, and Mr. Mell reported that he was delayed because he (Mr. Mell), "Was chasing Zucc from coyotes." Their text conversation resumed on Monday, May 7, 2018 at 5:35 PM when Mr. Mell asked Mr. Fournier, "Hey I hope it is ok I put you down as a reference for my firearms ID card. I have some coyotes I need to deal with."  Mr. Fournier inquires, "When are they around?" Mr. Mell responds, "A lot these days. Scaring me actually." Their text conversation resumed on Tuesday, May 8, 2018 at 5:16 PM. Mr. Mell writes, "Hey try to return the firearms referral when you get it if you don't mind. They say that is usually what holds things up. There are 2 coyotes that are hanging around and I think they think Zucc is one of them."

> [Exhibit "I" (Coleman Report, dated May 22, 2018)]

18

Diane Frederick, an employee at W.H. Mell, also recalled speaking with Mr. Mell regarding his "coyote problem." Mr. Mell and Ms. Fredrick often discussed dogs because each of them had two dogs which allowed them to commiserate about the challenges of raising the two dogs. On May 21, 2018, Mr. Coleman interviewed Ms. Frederick about the conversation she had with Mr. Mell.

> Ms. Frederick stated that the conversation took place the first week in May, 2018, possibly Tuesday, May 1, 2018 or Wednesday May 2, 2018. Ms. Frederick stated that the day the conversation took place, Mr. Mell called her into his office to discuss an incident that occurred on his property involving coyotes and his dog. She explained that they often discussed dogs, as Mr. Mell and Ms. Frederick both have two dogs each. She stated that Mr. Mell has a husky breed puppy named "Zuek," who is approximately 9 months to one year old, and another smaller breed dog. Ms. Frederick described the incident that Mr. Mell reported to her involving the coyotes and his dog. Mr. Mell stated that he was preparing to go to a dinner and was getting out of the shower when he looked out the window. Outside, he saw his dog Zuek sitting on the edge of the property. He was looking up at two coyotes, on a ridge on the outskirts of the property. Mr. Mell immediately got dressed, ran to the barn, grabbed a machete and chased the coyotes away. Ms. Frederick stated that there is no fence surrounding Mr. Mell's property and he was concerned about the coyotes killing his dogs.

[Exhibit "J" (Coleman Report, dated May 22, 2018)]

Mr. Mell lost his firearms identification card, so he went to the police station on May 8th to apply for a duplicate copy of his firearms identification card. Exhibit "K" Application for Firearms Purchaser Card and/or Handgun Purchase Permit, dated May 8, 2018). Once at the police station, Mr. Mell was advised by a woman at the window that he should also apply for a handgun permit if he ever wanted to purchase handguns. Mr. Mell was told the paperwork was the same.

To that end, Mr. Coleman interviewed Chief Rock of the Bedminster Police Department. Chief Rock who confirmed the police were aware of the coyote problem in the Bedminster area. Chief Rock also confirmed that the advice of the police department is to apply for multiple gun permits, due to the convenience of having only one application. Mr. Coleman's report states;

> Chief Rock confirmed that Mr. Mell submitted an application for a "Lost or Stolen ID Card." He did not know who took Mr. Mell's application, but stated it could have been anyone at the police department, depending upon when he submitted the application. Chief Rock confirmed that it is common practice to advise applicants to submit multiple Applications to Purchase a Handgun, even if they are not going to use them. He stated, "It's more convenient. You can get up to six in one ask. Ultimately a lot of people just get them and never purchase anything. I spoke to Chief Rock about Mr. Mell's assertion that he needed to purchase a long gun due to seeing coyote on his property. Chief Rock stated, "It's Bedminster" and that it was "coyote season." He further stated "with the amount of property he has, he probably could make application to fish and game to shoot wildlife on his property."

[Exhibit "L" (Coleman Report, dated May 23, 2018)]

*Mental Health and Medications*

In the interview with Mr. Hernandez, Mr. Mell failed to identify his anxiety and depression as a mental health disorder. Additionally, Mr. Mell failed to state he was on any medications at the time of his arrest. As discussed above, the failure to disclose these issues and medications where simply a misunderstanding and not an intent to deceive. Just days prior to his arrest, Mr. Mell met with his doctor, Dr. Campbell. During that consultation, Mr. Mell explained to Dr. Campbell that he was feeling much better, and that he was significantly less anxious and not depressed at all. Dr. Campbell was beginning to wean Mr. Mell off of Clonazepam, he had ceased taking Paxil, and was taking Xanax only as needed.

Additionally, Mr. Mell did not associate his anxiety as a mental health problem that was responsive to Mr. Hernandez's question.  Aside from the stigma attached to mental health disorders and their diagnosis, it is understandable that Mr. Mell associated his anxiety and depression as temporary, having only suffered from these issues because of the death of his close friends.  These issues were exacerbated by a possible legal investigation.

Finally, Mr. Mell's lack of disclosure of his mental issues and medications are not relevant to whether the Defendant is a flight risk or a danger to others.

*Gulfstream CM, LLC*

According to Bloomberg.com, Gulfstream CM, LLC is an asset and wealth management company that provides investment advisory services.  The Company offers portfolio management and financial planning services, as well as manages investors accounts.  Gulfstream CM serves clients in the United States. The company was started by Mr. Mell and his two business partners in April of 2011.  Mr. Mell retired from the company on April 6, 2018.  Exhibit "M" (Agreement between S. Bradley Mell and Gulfstream CM, LLC dated April 6, 2018).

In the interview with Mr. Hernandez, Mr. Mell did not identify Gulfstream CM, LLC as an employer or a source of revenue.  In a subsequent interview with Kimberly Mell, Ms. Mell identified Gulfstream CM, LLC as a present employer.  This was inaccurate.

The fact of the matter is Mr. Mell did not work for Gulfstream CM, LLC at the time of interview on May 9, 2018 because he retired from the company on April 6, 2018.  He does, however, receive retirement income from the company for 5 years, after the date of his retirement.

21

**D.      Nature and Seriousness of Danger Posed by Defendant's Release.**

We are aware of the trepidation that law enforcement and the Court have with releasing a person they believe is a danger to himself and others.  However, as the exhibits show, Mr. Mell has never been a danger to himself or others.  Furthermore, Mr. Mell was aware of the potential criminal investigation for several months and did not flee, divest assets, or harm himself.  Instead he chose to acknowledge and prepare for his as discussed above.

## CONCLUSION AND PROPOSED BAIL PACKAGE

Mr. Mell has carried his burden of production to overcome the rebuttable presumption of detention.  *See Perry,* 788 F.2d 114.  The government has not proved by preponderance of the evidence that Mr. Mell is a flight risk, *see Himler,* 797 F.2d 161, nor has the government proved by clear and convincing evidence that Mr. Mell is a danger to himself or the community.  *See* 18 *U.S.C.* § 3142(f).

As to factor one under 18 *U.S.C.* § 3142(g), the nature and circumstances of the offence charged, 18 *U.S.C.* § 2422(b) (Online Enticement of a Minor) is meant to punish a person anonymously sitting behind an electronic device trolling the internet for underage victims.  There is no allegation in this case that Mr. Mell was an anonymous troll.  Rather, Mr. Mell and the minor were introduced to each other through an adult intermediary (i.e., the minor's mother) and later allegedly communicated about a relationship that was already in existence.

Moreover, there is no allegation in this case that Mr. Mell attempted to overcome the will of the minor though "inducement," "persuasion," "enticement," "coercion," or otherwise *See Hite*, 769 F.3d 1161 (D.C. Cir. 2014) (an effort to transform or overcome a minor's will is required under the statute).  While the communications here are alleged to be sexually charged,

22

none of the communications demonstrate any effort by Mr. Mell to transform or overcome the minor's will.  Simply discussing sexual activity with a minor does not equate to an effort to transform or overcome the minor's will under the law.

As to factor two, the weight of the evidence against the defendant, we believe for the reasons set forth in the analysis of factor one that the government has misapplied the law by charging Mr. Mell with violating 18 *U.S.C.* § 2422(b). This case is overcharged.

As to factor three, Mr. Mell has a lifetime of contacts in the New Jersey area.  Along with the support of his friends, Mr. Mell is anchored by the love and support of his family.  Mr. Mell is a father to two daughters, Emily and Eliza, as well as a son, William.  He served for 15 years as a board member at Westminster School, the last two years of which he also served as Chair of the Investment Committee.  Mr. Mell also devoted time and service on the Far Hills Day School board for 10 years as a way to give back to the school that helped him overcome his extreme dyslexia.  He served for over 10 years as the Chairman for Building and Grounds. And, in 2017, Mr. Mell was celebrated with a special dedication for his work during his 10-year volunteer service to the school.

Mr. Mell holds several professional licenses in finance, including the series 63, 7, 52, 24 and 53.  He is President of W.H. Mell, and responsible for the continued employment and financial support of over 15 associates and their families, support which will abruptly cease if Mr. Mell is not able to access his business to keep it running during this litigation.  Moreover, Mr. Mell's own family relies on the support that his income provides, and interruption would be an undue burden on his family as well.

In addition, Mr. Mell has started his own charitable foundation, Air Lifeline (merged with Angel Flights in 2009), that has donated to families of children with medical needs and provided them with the ability to fly anywhere in the country in order to received medical treatment.  Mr. Mell is also a donor to the Mooreland Foundation, Morristown Memorial Hospital, NJ Visiting Nurse Association, Far Hills Day School, Westminster School, Red Cross, and Brady Life Camp (a Newark inner-city kids camp).  He has given to countless other charities choosing to remain anonymous in his generosity.

Mr. Mell has led of life free from criminal prosecution and is considered by his friends and family as an asset to his community.  Mr. Mell has consistently demonstrated throughout his life his accountability and integrity to his family, his business, his employees, his clients, and the community.  His invitation to sit on multiple school boards, local clubs and organizations, along with his 25-year stellar track record with his clients further shows that he is a man who is trusted by many respected members of our community.

Mr. Mell is not a flight risk.  His actions during the pendency of the criminal investigation not only demonstrate accountability and responsibility, but also go well beyond good faith.  Though becoming aware in December 2017 that he was under investigation by the Hunterdon County Prosecutor's Office, Mr. Mell did not flee or leave the jurisdiction.  Instead, he hired counsel to represent his interests in the criminal investigation and offered to turn himself in if he was charged.  He also hired counsel to handle demands for money made by the alleged victim's family.

These are not the actions of a person who intends to and/or has the pre-disposition to flee from his problems.  In fact, Mr. Mell further demonstrated his accountability when, in February

24

2018, he secured a letter from his doctor so that if he was arrested, the jail would be aware of his medical needs.

Mr. Mell's trustworthiness was again demonstrated when, prior to being charged but during the time he was aware of a pending investigation, Mr. Mell took two international vacations the Dominican Republic and the Bahamas, each time returning to New Jersey.

Furthermore, Mr. Mell has taken proactive steps to secure the planes and helicopters to ensure that he no longer access to them. The King Air Beechcraft B200, located at the Somerset County Airport, is stored in a hangar and the locks on the hangar have been changed. Mr. Mell executed a memorandum of understanding which was directed to the Somerset County Airport which states that he agrees not to access or use any hangar or aircraft at the Somerset County Airport including but not limited to the 1981 Beech King Air.

The second plane, a Hawker XP800, is stored in Pennsylvania. This plane has been grounded for unpaid bills, and it also requires a charter as well as an FAA flight plan before it can be flown, and Mr. Mell lacks the rating and ability to fly this particular aircraft.

The helicopter is owned by WFNW, LLC which is a leasing company, through which Mr. Mell purchased the helicopter. The helicopter is leased by Platinum Helicopters, LLC and has been used as a charter helicopter for executive travel. It is stored by Evan Van Gilson who is a friend of Mr. Mell's as well as a former law enforcement officer. The lock to the hangar has been changed, and Evan Van Gilson agrees not to provide access to Mr. Mell.

Additionally, Mr. Mell agrees to forfeit his pilot's license as a condition of bail, and Ms. Mell, trustee of the company that owns the airplanes and helicopter, has already advised Pretrial

Services that she will not allow Mr. Mell to have access or use the planes/helicopter if he is released on bail.

As to the concerns raised by in the Pretrial Services Risk Assessment and Release Report, the record is replete with witness statements that Mr. Mell applied for a duplicate firearms identification card and handgun purchase permit in order to protect himself, his family, and the family's dog from coyotes and other wildlife recently seen on Mr. Mell's property.

Additionally, Mr. Mell's lack of disclosure of his mental issues and medications are not relevant to whether the Mr. Mell is a flight risk or a danger to others. First, Mr. Mell did not associate his anxiety as a mental health problem that was responsive to the questions asked by Pretrial Services. Mr. Mell associated his anxiety and depression as temporary, having only suffered from these issues because of the death of his close friends, exacerbated by the criminal investigation. In addition, Mr. Mell met with his doctor for a consultation just days prior to his arrest, and the doctor was beginning to wean Mr. Mell off Clonazepam, who had also advised Mr. Mell to cease taking Paxil and only take Xanax as needed.

Finally, in the interview with Pretrial Services, Mr. Mell did not identify Gulfstream CM, LLC as an employer or a source of revenue. In a subsequent interview with Kimberly Mell, Ms. Mell identified Gulfstream CM, LLC as a present employer. The fact of the matter is Mr. Mell retired from the company on April 6, 2018 and therefore did not work for Gulfstream CM, LLC at the time of interview on May 9, 2018.

Mr. Mell is neither a danger to himself or others. And, though aware of the criminal investigation for several months, Mr. Mell did not flee, divest assets, or harm himself. Instead, Mr. Mell acknowledged the investigation and offered surrender himself if charges were filed.

Based on the foregoing, we believe a combination of conditions will reasonably assure Mr. Mell's appearance at trial and safeguard the community in the interim:

1. Mother's house as asset (Approx. $800,000)

2. Residence- Dan and Helen Paglia, 1050 Lager Cross Road, Far Hills, NJ; second floor apartment. As professionals, they are fully aware of their responsibilities as dependable custodians. They take on the responsibility willingly and freely.

3. Custodians- Dan and Helen, Diane Hendricks

4. Agrees not to leave the state of New Jersey without Court approval

5. Lockdown of the Planes and Helicopters

6. Turn over keys to the Planes and Helicopters

7. Turn over pilot's license

8. Mandatory Ankle Monitoring pursuant to statute

9. Forfeit passport (already seized during execution of the search warrant)

10. No contact with the alleged victim.

11. Follow recommendations of Psych evaluation.

Very Truly Yours,
THE BIANCHI LAW GROUP, LLC
*Attorney for Steven Bradley Mell*

ROBERT A. BIANCHI, ESQ
(NJ BAR ID 036801988)

27

# EXHIBIT A

May 22, 2018

To Whom It May Concern,

This letter is being written because I want you to understand who my son, Steven Bradley Mell is as a person. Since he was a young boy, he has always been a hard worker with integrity and determination to not only succeed at a job, but to do it the right way. He has carried this through into adulthood where along the way he has made many friends and has earned the respect of individuals and industry professionals! Eventually he took over as the President of the family business from his Father and has made it an even more successful and reputable company in the investment industry where it is highly regulated and mistakes do not go unpunished. To this day, there has never been any negative action taken against him or the business.

Unlike a lot of men in the profession, Bradley is not the type of person who is influenced by people who are running around running to cocktail parties and flaunts their money. In fact, despite his success, he spends more time giving than taking while taking drastic steps to keep his actions as low key and private as possible as he is not looking for the attention. A great example of this is when a young man he knows lost all of his parents retirement money on bad investments. Instead of just saying that is too bad and walking away, Brad out of his own pocket put the amount of money lost back into the family's account unbeknownst to the family. Eventually, when they found out what Brad had done, they wrote a beautiful letter to thank him even though he didn't have to do it. Another example is when he sent his plane up to Nantucket, at his own expense, when a friend's father had died to make sure that all of his friends friend(s) were there for the services and his friend had no idea who did it. It wasn't until a week or two later that the friend finally found out and he was incredibly grateful to Brad for having made sure as many people as possible could be with his family at a time of crisis.

The final example I'll give you is when one of Brad's oldest friends experienced his two sisters being killed in an automobile accident. When Brad found out from his older brother what had happened, he immediately dropped everything and went to the hospital to be with his friend and the Father to provide support in any way he could.

In conclusion, I want the courts to know I have never had a problem with Brad and that he is not some little rich boy running around showing off. He doesn't smoke, drink or do drugs for which I am very thankful for as a mother and if I had a daughter, I would love to have her marry a man like him. I know every mother will say how wonderful their kids are, but Brad truly is a good son and I am very proud of him as has he been there for me at 81 and fighting cancer and always with a smile. He adores his family more than you will EVER know and spends every moment he can with them when he is not working, whether that being going out to his daughters concert or his other daughters athletic game or taking his son to his games and loves it. We are a very close family and will always remain that way...I could not ask anymore of him so I ask you to have an understanding who Brad is as a person.

Thank you

Diana D. Mell

May 28th, 2018

To Whom this may concern:

This is a character reference for Steven Bradley Mell of Bedminster (Far Hills) New Jersey.

Brad, as he is known, and I, have literally known each other our whole lives, we grew up together as neighbors and were in the same class at the same school, we were and are as the expression goes, best friends, we also shared a core group of friends that would become like brothers and sisters to one another during these early years. During our childhood/young adult years Brad and I worked together over many summer vacations, sand-blasting pools, installing post and rail fencing, cutting fields(him more than me) and cutting an extremely large amount of grass. Our summer entrepreneurial partnerships culminated when we formed a company together inspired by his growing love for flying, called Aero Care Services, to capitalize on what he had recognized as an untapped market, detailing (cleaning) small private planes, eventually we would add cars to our service, and for several summers the two of us spent 10 hours a day together meticulously cleaning planes and cars. When it came time for the two of us to move on to the next stages of our lives, the discussion of selling our business was entertained, however, Brad (and I agreed) was quick to conclude that that was not a risk worth taking, regardless of the potential short term benefit to ourselves. His concern was that we had forged a high degree of trust with our customers to which he couldn't in good conscience risk jeopardizing by putting them in the hands of someone we didn't know. So at the end of the day, the decision was made to wind the business down. Besides the obvious strong work ethic Brad possesses, his real defining character trait is his integrity, it's a quality that pervades every aspect of his life. On a further note, Brad would keep the Aero Care Services name and eventually put it to much better use later in life, providing life flights/Angel Flights to patients in medical need who didn't have the means or resources to otherwise reach specialized treatment facilities out of their geographic reach, free of charge.

While we parted ways geographically for our high school and college years we always reconnected during our vacations back in New Jersey, in fact, after we both graduated college I moved to Boston where Brad had been living while attending Boston University, and for the next several years we shared an apartment while we embarked on our respective career paths. Perhaps we would have lived together for longer had it not been for the fact that during that time Brad met Kim Ruggles, who would soon become Kim Mell, for which I had both the pleasure and honor at their wedding to serve as Best man.

So when asked if I would be willing to provide a character reference on behalf of Brad, the answer was quick and easy, "Of course." The difficulty however, comes in trying to convey a 50 year relationship into a short brief synopsis. Certainly one starting point would be to describe the product of his life, and work backwards to see how he got there.

If one were to meet his three lovely children, Emily, Eliza, and William it would be immediately apparent to any observer of their reserved graciousness, not to be mistaken for politeness, although they share that quality as well. It wouldn't take long for an outsider looking in to notice the energetic glow that these children exude, call it a smile that seems to be there even in the absence of a smile. These hard to describe, but noticeable character traits, may be brushed off by casual observers simply as the product of good fortune, but those judgements would be mistaken, dare I say just plain wrong. To anyone whose had the opportunity to spend time with Brad and his family they would be familiar with what I am describing and it would likely bring a warm smile to their faces. If there's any question as to what I'm describing, the answer is simple. Love. Now to the prying eye, such a statement might be brushed off or discounted as a basic parental responsibility, the baseline that we, as parents, should be expected to provide, and while most would agree with that, and Brad certainly has provided that, that is not what I'm referring to. The aspect of Brad that I'm trying to articulate is that of, engagement. Perhaps a quick anecdote to elaborate the point. For the many people who have dogs, most

will tell you they love them, and that would likely be true. Then there are people who have dogs and, like children naturally are inclined to do, can be frequently spotted playing with them regularly, in their case, you know they love them, you see it through their actions, that's engagement. Brad is an engaged and involved father, his love for his children expressed in both word and action and in plain view for all to see, and frankly, given how hard he has had to work to achieve the level of success he's earned, it makes it that much more remarkable. The result, or should I say proof of these statements lie in Brad's children and their response to all that has recently transpired. While terribly disappointed over their father's situation, all three are unwavering in their love and support for him.

Aside from being a loving parent, other attributes that describe Brad are, conscientious, generous, and committed. These traits are part of Brad's DNA and are reflected in the manner in which he conducts himself in all aspects of his life and they have not gone unrecognized by those in his community. Brad has been sought out to serve on the board of trustees for multiple institutions, committing to several for which I am aware. One of which perfectly encapsulates the message I hope to convey. Brad served on the Board of Trustees at Far Hills Country Day School, the school we both attended together and the school he would send his three children to. In May of 2017 I attended an event that Far Hills Country Day School sponsored solely to honor Brad, it was not I should emphasize, to simply thank him for some outsized financial gift, it was however, to present him with what they called "The Unsung Hero Award." This newly created award inspired by Brad's actions was Far Hills Country Day School's way of not allowing all that Brad had done for the school to go unrecognized. The irony of it all is that Brad doesn't seek out recognition, he is simply interested in how he can be most affective with his time and support, helping whenever and however he can.

Brad, who has been extremely fortunate in many aspects of his life has not been without life's set-backs. In October of 2012 his helicopter crashed, killing two of the three occupants, the pilot, Will Ellsworth, was a dear friend and amongst the two who perished, it was an event that had a major impact on his life, as he felt, had he been co-piloting perhaps things would have worked out differently. His bond with the Ellsworth family thankfully has only grown stronger, and he continues to fly Molly Ellsworth, the mother of Will Ellsworth, whenever and wherever she wants to go, I also believe she was one of the people who expressed interest in housing Brad. Please don't confuse this event as an attempt to garner sympathy, it's really about Brad's relationship with the Ellsworth family and the outpouring of support for one another which continues to this day. (the tail numbers on Brad's plane are Will Ellsworth's birthdate).

I have been one of the few people outside of family who has been in contact with Brad since he was arrested, and as is typical of Brad, his first concern is for his family and his employees, he feels deeply responsible for the impact his situation has had on all of them, and wants nothing more than the opportunity to alleviate this impact to the best of his abilities, and especially in the case of his employees, before it becomes irreparable. Brad understands and is committed to making the personal sacrifices he'll need to undertake to accomplish this, unfortunately it is made extremely difficult being held where he is.

Personally, like his children, extended family, and friends, I too will support Brad through this time in his life where things appear to have gone off path. Brad has earned the love, trust, and respect of many over the course of his life, and as such we now readily await to see how we can support him in his time of need.

Best regards,

Michael Simon Scott
1570 Clermont Drive #102
Naples, FL 34104

# EXHIBIT C

May 23, 2018

To Whom It May Concern,

The purpose of this letter is to give you an understanding of who and what my youngest brother, Steven Bradley Mell is all about as a person. Bradley has always been a hard worker with integrity and determination to not only succeed at a job, but to do it the right way starting when he was 16 years old. At that age he started his own business with a friend washing and detailing the inside/outside of airplanes and cars. He did such a great job that it didn't take long for his business to grow by word of mouth and for the next 4 years or so that was his summer job. He has carried his work ethic and integrity through into the business world where he has made many friends and has earned everyone's respect! In fact, he is so highly respected that he was asked to be on the Board of Directors at a number of places, including the private clubs he belongs to as well as private schools and charities.

Another point I'd like to make is that despite his success, he spends more time giving than taking while taking drastic steps to keep his actions as low key and private as possible as he is not looking for the attention. One great example of this is that Brad does Air Lifeline which is now known as Angel Life flights for people that need better medical care in a different part of the country so he either flies them himself to wherever or, at his own expense, has a pilot use his plane to get the patient to wherever they need to go. Another example is the amount of money he has helped raise for the schools and charities to help others (i.e Brady Camp for underprivileged kids from Newark, Mooreland Foundation, et al.). The list could go on and on but the bottom line is Brad is a man of strong character and integrity!

In conclusion, I want the courts to know that Brad has have never been a problem to anyone and he adores his family more than you will EVER know! Brad truly is a good son and has been there for our Mother who is 81 and fighting cancer. One last thing I'd like to say is that Brad is the person my wife and I chose to be legal guardian of my 2 little girls should anything ever happen to us and to this day that has not changed. We KNOW him and TRUST him!!

Sincerely,

William H. Mell III

# EXHIBIT D

May 24, 2018

To Whom it may concern –

I recently heard that Brad Mell is being held in jail. I have not spoken to Brad in several months and have no details of what he has been accused of doing. I am writing because I have known Brad for most of my life since we were childhood friends, and I wanted to share my observations of and personal interactions with Brad in support of his character.

Brad and I grew up on the same street. While we were not extremely close friends, we attended the same school and played on the same sports teams. Brad has always been a person who stood up for people and treated everyone with respect regardless of their age and role. He was well-liked by everyone and would always stick up for the underdog and be a trusted friend. In middle school, Brad would occasionally invite me to his house let me ride on his mini-bike or snowmobile that he had worked very hard to buy for himself. Starting in grade school, Brad was very driven and always had a job of sorts, and yet was very generous with his coveted "toys" and loved to share the excitement of riding them.

Brad and I would see each other occasionally during our high school and college years. As adults, we both eventually moved back to the community in which we grew up in New Jersey to raise our families. In my observation, Brad has been a very involved father, dedicating time to his kids at their school and in sports.

I can't remember all the history, but Brad began to work in his Dad's business (which I recall as good, but in somewhat of a decline before Brad became more involved). Similar to his childhood, Brad worked extremely hard, strengthened the business and built significant professional success. Brad has applied this success to help others. He has been an active volunteer and board member for many local organizations. He gives generously of his time and money to help causes, organizations and people.

The most important thing I remember about Brad, and why I am writing this letter, is what Brad did for me when my father died. Brad knew my father and knew how close we were. Brad had a similar relationship with his father. My father died in July 2012 and we planned the funeral shortly thereafter. It was in the middle of summer and many of my friends were on vacation and busy with their own young families. Entirely on his own, Brad arranged to fly about 8 of my closest friends to attend the service and return them back to their own families the same day so as not to disrupt family vacations. While Brad knows these folks through mutual friends, these were my closest college friends – not his. He knew how much the effort would mean to me at a very difficult time. He didn't ask anyone to help pay and wasn't doing it for any kind of personal gain, but rather because he knew how great it would be for me to have such a strong support network.

These are my personal experiences with Brad and I have always known him to have a great character.

Sincerely,

Perry Hall

# EXHIBIT E

LAW OFFICES

# CECONI & CHEIFETZ, LLC

CARY B. CHEIFETZ
LIZANNE J. CECONI
KIMBERLY A. RENNIE
VITO COLASURDO, JR.
CHRISTINA V. KOLEVICH
ERIKA PONE HANDLER
_____
NANCY C. RICHMOND
LINDA A. MAINENTI WALSH
    COUNSEL

25 DEFOREST AVENUE
SUITE 105
SUMMIT, N.J. 07901

(908) 273-6300
Fax (908) 273-4797
EMAIL: [LAST NAME]@CCFAMLAW.COM

May 25, 2018

***Via electronic ~ David_Hernandez@njpt.uscourts.gov and regular mail***
David E. Hernandez, U.S. Pretrial Services Officer
Martin Luther King, Jr. Federal Building & Courthouse
50 Walnut Street ~ Room 1018
Newark, New Jersey 07101

        Re:  **Mell v. Mell**
            <u>Docket No.: FM-18-724-18</u>

Dear Mr. Hernandez:

    This firm represents Kimberly Mell in connection with a pending matrimonial action with her husband Steven Bradley Mell. Mr. Mell's legal counsel in that matrimonial action has requested that Ms. Mell provide your office with certain information that he believes may be relevant to circumstances under which Mr. Mell may be released on bail. Accordingly, on behalf of Ms. Mell, I am providing the following information to you which may be confirmed with our client if necessary.

    First, Ms. Mell is supportive of Mr. Mell's release on bail.

    Second, Mr. Mell provides the financial support for our client's household, including the three children. He does so through W.H. Mell, Inc., a business he owns and operates. Ms. Mell is concerned that if Mr. Mell is not available to operate the business because he is detained, he will be unable to support the family.

    Third, there are two aircraft owned by a company that is held in a trust and Ms. Mell is the trustee of that trust. As trustee, she will not consent to allow him to utilize the aircraft while the criminal case is pending. Our firm is simultaneously notifying Mr. Mell's counsel that he is prohibited from utilizing the aircraft during such time period.

    Please advise if you require anything further from me or from Ms. Mell regarding issues relating to bail.

CECONI & CHEIFETZ, LLC

David E. Hernandez, U.S. Pretrial Services Officer
Martin Luther King, Jr. Federal Building & Courthouse
May 25, 2018                                                                              Page | 2

Thank you for your courtesy and kind attention.

Very truly yours,

CECONI & CHEIFETZ, LLC

BY: _____
CARY B. CHEIFETZ

CBC:sag
cc:  Nancy C. Richmond, Esq.
     David J. Bruno, Esq., *via electronic and regular mail*
     Robert A. Bianchi, Esq., *via electronic and regular mail*
     Christopher L. Weiss, Esq., *via electronic and regular mail*
     Samuel Weiner, Esq. *via electronic and regular mail*
     Donald A. Ottaunick, Esq., *via electronic and regular mail*
     Richard Iglar, Esq., *via electronic and regular mail*
     Ms. Kimberly Mell, *via electronic mail only*

# EXHIBIT F

# STEPHEN S. WEINSTEIN
A PROFESSIONAL CORPORATION
COUNSELLOR AT LAW
20 NORTH PARK PLACE, SUITE 301
MORRISTOWN, NEW JERSEY 07960-7102

STEPHEN S. WEINSTEIN
ATTORNEY ID# 227411966
MEMBER NJ, NY, & DC BARS
CERTIFIED BY THE SUPREME COURT OF NJ AS A CIVIL TRIAL ATTORNEY
CERTIFIED BY THE SUPREME COURT OF NJ AS A CRIMINAL TRIAL ATTORNEY


GAIL S. BOERTZEL
ATTORNEY ID# 019521976
MEMBER NJ & NY FED BARS
MARCY M. MCMANN
ATTORNEY ID# 022271993
MEMBER NJ & PA BARS
CERTIFIED BY THE SUPREME COURT OF NJ AS A CRIMINAL TRIAL ATTORNEY
TYRONE F. SERGIO
ATTORNEY ID# 041991996
MEMBER NJ & NY BARS

(973) 267-5200

(973) 538-1779
(FAX)

(800) 606-0607
(IN NEW JERSEY)

skippy@sswpa.com

December 28, 2017

**VIA FAX (908-806-4618) AND REGULAR MAIL**

Assistant Prosecutor Kelly Daniels
Hunterdon County Prosecutor's Office
65 Park Avenue
P.O. Box 756
Flemington, New Jersey 08822-0756

**Re:   Brad Mell**

Dear Assistant Prosecutor Daniels:

Please be advised that we represent Brad Mell.   It is our
understanding that your office and/or the Whitehouse Police
Department may be investigating Mr. Mell.   If so, please be
advised that Mr. Mell is exercising his right not to make a
statement.   Any communications regarding this matter should be
directed to me.   Should your office intend to file criminal
charges against Mr. Mell, kindly contact us so we can arrange for
him to cooperate with processing.

Very truly yours,

STEPHEN S. WEINSTEIN
A Professional Corporation

By: _____
Marcy M. McMann
Attorney ID# 022271993
marcy@sswpa.com

MMM:cpa

# EXHIBIT G

A. SCOTT CAMPBELL, M.S., M.D.
*General Internal Medicine*
2345 Lamington Road, Suite 105
Bedminster, New Jersey 07921
——————
Tel: 908-234-0890  Fax: 908-234-1432

2/26/2018

To whom it may concern,                              re: Mr. Steven Bradley Mell

Mr. Steven Bradley Mell has been my patient for twenty-two years. Following the death of a
very close friend in 2012, and the circumstances involved in his death, he has had significant
issues with both anxiety and depression.

He has been on a low dose of Xanax since the helicopter crash, in 2012. He informed me almost
three months ago about potential legal issues, and I have been seeing him for these past three
months, because of the stress and anxiety associated with his potential legal issues. He has been
under tremendous stress, and has had difficulty functioning and sleeping.

I have been prescribing Xanax for several years, at a low dose. In the past three months, I have
increased the dose of Xanax, and begun Paxil. As the stress of his situation has increased, I have
increased the dose of Xanax, and most recently, I have been prescribing Clonazepam, so that he
can sleep at night. He has been taking about 12 mgs. of Xanax daily, as well as 4 mgs. of
Clonazepam for sleep at night, in addition to Paxil, 20 mgs. daily.

He has recently informed me that in fact that he will be arrested and incarcerated for at least two
days in the near future. He must not abruptly discontinue these medications while incarcerated,
as to do so could trigger seizures and death. I will be glad to discuss Mr. Mell's medical
treatment with an appropriate physician, so that he is not subjected to abrupt discontinuation of
his medications. I stress that abrupt discontinuation of his medications can have serious, and
potentially lethal consequences.

You can call me in my office at (908) 234-0890, or on my cell phone at (908)963-0636 at any
time. If his arrest does occur when I am not in the office, please call me on my cell phone.

I have provided a copy of this letter to his lawyers should the arresting officers not be able to
promptly reach me.

Sincerely,

A. Scott Campbell, MS, MD

# EXHIBIT H

### OPERATING AGREEMENT

### OF

### AERO CARE SERVICES, L.L.C.

This Operating Agreement (this "Agreement") of Aero Care Services, L.L.C. (the "Company") is entered into as of June 27, 2000 by S. Bradley Mell ("SBM") and Kimberly Mell ("KM") (SBM and KM shall hereinafter, at times, be referred to together as the "Members" or individually as a "Member").

WHEREAS, the Company was formed on June 27, 2000, upon the filing of its Certificate of Formation with the Secretary of State of the State of New Jersey;

WHEREAS, the Members desire to adopt an operating agreement containing provisions relating to the business of the Company, the conduct of its affairs and the rights, powers, preferences, limitations and responsibilities of its members;

NOW, THEREFORE, the Members do hereby adopt this operating agreement as contemplated by the New Jersey Limited Liability Company Act, N.J.S.A. 42:2B-1 et seq. (the "Act").

1.   Name. The name of the limited liability company governed hereby is Aero Care Services, L.L.C.

2.   Purpose. The Company is formed for the object and purpose of, and the nature of the business to be conducted and promoted by the Company is engaging in any lawful act or activity for which limited liability companies may be formed under the Act.

3.   Registered Office. The address of the registered office of the Company in the State of New Jersey is c/o Cole, Schotz, Meisel, Forman & Leonard, P.A., 25 Main Street, Hackensack, New Jersey 07602.

4.   Registered Agent. The name and address of the registered agent of the Company for service of process on the Company in the State of New Jersey is Samuel Weiner, Esq., c/o Cole, Schotz, Meisel, Forman & Leonard, P.A., 25 Main Street, Hackensack, New Jersey 07602.

5.   Members. The names of the Members are as set forth above in the preamble to this Agreement.

1126096.1

6.   Powers.  The business and affairs of the Company shall be managed by the Manager.  The initial Manager of the Company is SBM. The Manager shall have the power to do any and all acts necessary or convenient to or for the furtherance of the purposes described herein, including, without limitation, (i) to incur debt on behalf of the Company, (ii) to acquire or sell any assets of the Company, (iii) to provide indemnities or guaranties in the name and on behalf of the Company, (iv) to enter into, perform and carry out contracts of any kind, including, without limitation, contracts with any person or entity affiliated with the Company, necessary to, in connection with, convenient to or incidental to the accomplishment of the purposes of the Company, and (v) to take any and all other actions he deems necessary, desirable, convenient or incidental for the furtherance of the objects and purposes of the Company, and shall have and may exercise all of the powers and rights conferred upon a limited liability company formed pursuant to the Act.   The Company shall not be required to hold annual meetings of its Members.

In addition, the Members may, from time to time, appoint such natural persons and such entities as they deem appropriate to conduct business on behalf of the Company, to approve transactions (including, without limitation, mergers and transfers of assets) on behalf of the Company and to execute documents as an "Authorized Signatory" of the Company until such authorization is revoked by the Members or another person or entity authorized to affect such revocation.    In furtherance of the foregoing, SBM is hereby delegated full power and authority to conduct the business and affairs of the Company, including, without limitation, power and authority to (i) approve mergers, transfers of assets and any other transactions on behalf of the Company; and (ii) execute any and all deeds, mortgages, notes, bonds, leases, contracts and other instruments on behalf of the Company, in each case in the capacity of an "Authorized Signatory".  The foregoing delegation (1) is in addition to, and shall not be deemed to limit in any way, the Authorized Signatory's authority to act on behalf of the Company as a result of the Authorized Signatory's ownership, directly or indirectly, of a controlling interest in the Company or its Members; and (2) shall continue until revoked by the Members or another entity or person authorized to affect such revocation.

7.   Dissolution.  The Company shall dissolve, and its affairs shall be wound up, upon the first to occur of the following: (a) the written consent of the Members, (b) the withdrawal or bankruptcy of a Member, or the occurrence of any other event which terminates the continued membership of a Member in the Company, or (c) the entry of a decree of judicial dissolution under the Act.

8.    Admission,    Percentage    Interests    and    Capital Contributions.    The Members are hereby deemed admitted as the Members of the Company as of June 27, 2000.    Each Member has contributed to the Company the capital set forth below.  As of the date hereof, the Members own percentage interests in the Company as follows:

| Member | Capital Contribution | Percentage Interest |
|--------|----------------------|---------------------|
| S. Bradley Mell | $ | 99% |
| Kimberley Mell | $ | 1% |

                                     **Total:**        100%

9.    Additional Contributions.    The Members are not required to make any additional capital contribution to the Company. However, the Members may, in their sole discretion, make additional capital contributions to the Company.

10.    Allocation of Profits and Losses.  The Company's profits and losses shall be allocated to the Members in accordance with their percentage interests in the Company as set forth in Section 8 hereof.

11.    Distributions.    Distributions shall be made to the Members at the times and in the aggregate amounts determined by the Members.

12.    Admission of Additional Members.  One or more additional members of the Company may be admitted to the Company with the consent of the Members.

13.    Limited Liability.  Except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and the Members and the Manager shall not be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a member or manager of the Company.

14.    Governing Law.  This Agreement shall be governed by, and construed under, the laws of the State of New Jersey, all rights and remedies being governed by said laws, without regard to principles of conflict of law.

15.    Treatment for Tax Purposes.  The Company shall be taxed as the Members elect.

16. <u>Amendments</u>. This Agreement may not be modified, altered, supplemented or amended except pursuant to a written agreement executed and delivered by the Members.

17. <u>Indemnification of Indemnified Persons</u>. To the fullest extent permitted by applicable law, in the event that a Member or Manager, or any of its direct or indirect partners, members, trustees, directors, officers, shareholders, employees, incorporators, agents, affiliates or controlling persons (collectively, the "Indemnified Persons"; each, including the Member, an "Indemnified Person"), becomes involved, in any capacity, in any threatened, pending or completed action, proceeding or investigation, in connection with any matter arising out of or relating to the Company's business or affairs, the Company will periodically reimburse such Indemnified Person for its legal and other expenses (including the cost of any investigation and preparation) incurred in connection therewith, provided that such Indemnified Person shall promptly repay to the Company the amount of any such reimbursed expenses paid to such Indemnified Person if it shall ultimately be determined that such Indemnified Person is not entitled to be indemnified by the Company in connection with such action, proceeding or investigation as provided in the exception contained in the next succeeding sentence. To the fullest extent permitted under the law of the State of New Jersey as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Company to provide broader indemnification rights than said law permitted the Company to provide prior to such amendment), the Company also will indemnify and hold harmless each Indemnified Person against any losses, claims, damages, liabilities, obligations, penalties, actions, judgments, suits, proceedings, costs, expenses and disbursements of any kind or nature whatsoever (collectively, "Costs"), to which such Indemnified Person may become subject in connection with any matter arising out of or in connection with the Company's business or affairs, except to the extent that any such Costs result solely from the willful misfeasance, gross negligence or bad faith of such Indemnified Person. If for any reason (other than the willful misfeasance, gross negligence, or bad faith of such Indemnified Person) the foregoing indemnification is unavailable to such Indemnified Person, or insufficient to hold it harmless, then the Company shall contribute to the amount paid or payable by such Indemnified Person as a result of such Costs in such proportion as is appropriate to reflect not only the relative benefits received by the Company on the one hand and such Indemnified Person on the other hand but also the relative fault of the Company and such Indemnified Person, as well as any relevant equitable considerations. The reimbursement, indemnity and contribution obligations of the Company under this Section 17 shall be in

addition to any liability which the Company may otherwise have to any Indemnified Person and shall be binding upon and inure to the benefit of any successors, assigns, heirs and personal representatives of the Company and any Indemnified Person. The reimbursement, indemnity and contribution obligations of the Company under this Section 17 shall be limited to the Company's assets, and no member or manager all have any personal liability on account thereof. Any amendment or repeal of this Section 17 shall net adversely affect any right or protection existing hereunder immediately prior to such amendment or repeal. The foregoing provisions shall survive any termination of this Agreement.

18. Exculpation. Notwithstanding any other terms of this Agreement, whether express or implied, or obligation or duty at law or in equity, no Indemnified Person shall be liable to the Company or any member or manager for any act or omission (in relation to the Company, this Agreement, any related document or any transaction contemplated hereby or thereby) taken or omitted by an Indemnified Person in the belief that such act or omission is in or is not contrary to the best interests of the Company and is within the scope of authority granted to such Indemnified Person by this Agreement, provided that such act or omission does not constitute willful misfeasance, gross negligence or bad faith of such Indemnified Person.

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, have duly executed this Agreement as of the date first above written.

WITNESS:                                MEMBERS:

_____       _____
                                         S. Bradley Mell

_____       _____
                                         Kimberly Mell

# EXHIBIT I

## ASSIGNMENT OF MEMBERSHIP INTEREST

FOR VALUE RECEIVED, I, STEVEN BRADLEY MELL, do hereby assign all of my right, title and interest in and to a 99% Class B membership interest in AERO CARE SERVICES, L.L.C., a New Jersey limited liability company, to KIMBERLY RUGGLES MELL, not individually but solely as trustee of the STEVEN BRADLEY MELL 2012 FAMILY TRUST, dated Dec 18th, 2012. Said assignee shall take the membership interest subject to all of the terms and conditions of the Operating Agreement for AERO CARE SERVICES, L.L.C., dated January 1, 2003, as amended.

Dated 12-18, 2012

_____
STEVEN BRADLEY MELL

33762/0003-9031519v1

# EXHIBIT J

## SOMERSET COUNTY AIRPORT AGREEMENT

I, STEVEN BRADLEY MELL, of the Township of Bedminster, County of Somerset and State of New Jersey, do hereby agree to the following:

1. I will not to access or use any hangar or aircraft at the Somerset County Airport including but not limited to a 1981 Beech King Air, Serial Number BB-1209, FAA Registration Number N126SP ("King Air") which is currently being stored in a hangar at the Somerset Airport.

2. AERO Care Services, LLC is a company held in trust which owns the King Air.

3. My wife, Kimberly Ruggles Mell, serves as the trustee of AERO Care Services, LLC.

4. Kimberly Ruggles Mell, through a letter dated May 25, 2018 written by her attorney Cary Cheifetz, Esq. to David E. Hernandez, US Pretrial Services Officer, had also represented that she will not consent to my use or access to any of the aircraft owned by AERO Care Services, LLC, including but not limited to the King Air.

5. I also request that lock(s) to the hangar which stores the King Air be changed as requested by Evan Van Gilson.


IN WITNESS WHEREOF, I have hereunto set my hand and seal the 27th day of _____, 2018.

(L.S.)

STEVEN BRADLEY MELL


Signed in the Presence of:

ROBERT A. BIANCHI, ESQ.

2

# EXHIBIT K

# OPERATING AGREEMENT
## FOR
## WNFW, LLC
## A DELAWARE LIMITED LIABILITY COMPANY

THIS OPERATING AGREEMENT (**"Agreement"**) is made and entered into and effective as of October 1, 2014 by Steven Bradley Mell (**"Member"**) with reference to the following facts:

On September 30, 2014, a Certificate of Formation (**"Certificate of Formation"**) for WNF, LLC (**"Company"**), a limited liability company under the laws of the State of Delaware, was filed with the Delaware Secretary of State.

On October 1, 2014, a Certificate of Amendment (**"Certificate of Amendment"**) changing the name of the Company from WNF, LLC to WNFW, LLC, was filed with the Delaware Secretary of State.

The initial Members, Steven Bradley Mell and Kimberly Ruggles Mell, hereby adopt and approve this Operating Agreement for the Company.

NOW, THEREFORE, the parties by this Agreement set forth the operating agreement for the Company upon the terms and conditions contained herein.

## ARTICLE 1
## ORGANIZATIONAL MATTERS

1.1 **Formation of the Company.** The Company has been formed pursuant to the provisions of the Delaware Limited Liability Company Act as set forth in Title 6 (commencing with Section 18-101) of the Delaware Code (the "**Act**") by filing the Certificate of Formation with the Secretary of State.

1.2 **Name.** The name of the Company is WNFW, LLC per the Certificate of Amendment. The Members shall operate the Company under such name or, upon compliance with applicable laws, any other name that Members deems appropriate or advisable. The Company shall file any fictitious name certificates and similar filings, and any amendments thereto, that Members considers appropriate or advisable.

1.3 **Term.** The term of the existence of the Company shall be perpetual, commencing on the date of the filing of the Certificate of Formation with the Delaware Secretary of State, unless the Company is terminated or dissolved sooner in accordance with the provisions of this Agreement.

1.4 **Business and Purpose of the Company.** The purpose of the Company is to lease equipment and to engage in any lawful activity for which a limited liability company may be organized under the Act.

1

1.5   **Principal Place of Business.**   The Company's principal place of business shall be located at c/o Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, DE 19808. The Company may locate its place or places of business and registered office at any other place or places as the Members may from time to time deem advisable.

1.6   **Resident Agent.**   The name and address of the Company's resident agent in the State of Delaware is as follows:

> c/o Corporation Service Company
> 2711 Centreville Road, Suite 400
> Wilmington, Delaware 19808

The registered office and registered agent may be changed from time to time by filing the address of the new registered office and/or the name of the new registered agent with the Secretary of State of the State of Delaware pursuant to the Act.

1.7   **Members and Membership Interests.**   The name, address and percentage ownership of the Members are as set forth on <u>Schedule A</u> attached hereto and made a part hereof and his contribution on <u>Schedule B</u> attached hereto and made a part hereof. **"Members"** shall be defined as each of the parties who executed a counterpart of this Agreement as a Member and each of the parties who may thereafter become a Member. Additional Members may be admitted pursuant to this Agreement and the Act. If a person or entity is a Member immediately prior to the purchase or other acquisition by such person or entity of an economic interest, such person or entity shall have all of the rights of a Member with respect to such purchased or otherwise acquired Membership Interest, as the case may be. A **"Membership Interest"** is a Member's entire interest in the Company, including such Member's economic interest and such other rights and privileges that the Member may enjoy by being a Member.

## ARTICLE 2
## CAPITAL ACCOUNTS AND CONTRIBUTIONS

2.1   **Member's Capital Contributions.**   Not later than three days after execution of this Agreement, each Member shall contribute its initial capital contribution as stated in <u>Schedule B</u> hereto. Each Member shall be required to make Additional Capital Contributions on a monthly or quarterly basis or as otherwise determined by the Company pursuant to this Agreement.

   a.   **Additional Contributions.**   From time to time and upon a two-thirds vote of the Members which are not in default or continue to be in default pursuant to this Agreement or any other agreement by and between any such Member and the Company (hereinafter **"Member in Good Standing"**), the Members in Good Standing may determine from time to time that additional capital contributions are needed to enable the Company to conduct its business and affairs. Upon making such a determination, notice thereof shall be given to all Members in writing at least ninety (90) days prior to the date on which such additional contributions are needed. The notice shall describe in reasonable detail the

2

purposes and uses of the additional capital, the amount of additional capital needed, the date by which the additional contribution is required and the proportion of contribution from each Member.

2.2 **Capital Accounts.**   A separate Capital Account shall be maintained for each Member. Each Member's Capital Account shall be increased by (1) the amount of money contributed by such Member to the Company; (2) the fair market value of property contributed by such Member to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under the Internal Revenue Code); (3) allocations to such Member of profits; and (4) any items in the nature of income and gain which are specially allocated to the Member pursuant hereto. Each Member's Capital Account shall be decreased by (1) the amount of money distributed to such Member by the Company; (2) the fair market value of property distributed to such Member by the Company (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to under the Internal Revenue Code); (3) any items in the nature of deduction and loss that are specially allocated to the Member pursuant hereto; and (4) allocations to such Member of losses.

Without limiting the other rights and duties of a transferee of a Membership Interest pursuant to this Agreement, in the event of a Permitted Transfer of a Membership Interest in the Company, (1) the Capital Account of the transferor shall become the Capital Account of the transferee to the extent it relates to the transferred Membership Interest in accordance with the applicable Treasury Regulations; and (2) the transferee shall be treated as the transferor for purposes of allocations and distributions pursuant hereto, to the extent that such allocations and distributions relate to the transferred Membership Interest.

Upon liquidation of the Company, liquidating distributions shall be made in accordance with the positive Capital Account balances of the Members, as determined after taking into account all Capital Account adjustments for the Company's taxable year during which the liquidation occurs. The Company may offset damages for breach of this Agreement by any Member or any agreement by and between any such Member and the Company, whose Membership Interest is liquidated or Transferred (either upon the withdrawal of the Member or the liquidation of the Company) against the amount otherwise distributable to such Member. No Member shall have any obligation to restore all or any portion of a deficit balance in such Member's Capital Account. A Member shall not receive a distribution of any part of its Capital Contribution to the extent such distribution would violate this Agreement.

2.3 **Distributions.**   Subject to applicable law, from time to time and upon a two-thirds vote of the Members in Good Standing the Company may distribute "**Available Cash Flow**". "Available Cash Flow" means, with respect to any period, the sum of all cash receipts of the Company from any and all sources, less all cash disbursements and a reasonable allowance for reserves, contingencies and anticipated obligations as determined by the Members in Good Standing.

2.4 **Return of Distributions.**   Except for distributions made in violation of the Act or this Agreement, the Members shall not be obligated to return any distribution to the Company

3

or pay the amount of any distribution for the account of the Company or to any creditor of the Company. The amount of any distribution returned to the Company by the Members or paid by the Members for the account of the Company or to a creditor of the Company shall be added to the account or accounts from which it was subtracted when it was distributed to the Members.

2.5 **Allocations of Profits and Losses.** The profits and losses for each fiscal year for operations related to the assets and property of the Company and other Company matters shall be allocated to the Members in Good Standing proportionately in accordance with their Membership Interests.

2.6 **Interest on and Return of Capital Contributions**. No Member shall be entitled to interest on its Capital Contribution or to return of its Capital Contribution, except as otherwise specifically provided for herein.

2.7 **Loans to Company**. Nothing in this Agreement shall prevent any Member from making secured or unsecured loans to the Company by agreement with the Company and the other Members. The amount of any such loan or advance shall not be treated as a contribution to the capital of the Company but shall be a debt due from the Company, payable in full, together with accrued interest, prior to any distribution thereafter to any Member. All such loans or advances shall be repayable, pro rata, from net cash flow available from time to time and shall bear interest, until fully repaid, at a floating rate equal to five (5) percentage points in excess of the prime commercial lending rate in effect from time to time at the principal bank used by the Company for banking and borrowing purposes. In addition to the Member loans, the Company may borrow funds pursuant to the terms and conditions of this Agreement from commercial lending institutions, individuals, private firms, corporations, or other entities on commercially reasonable terms.

2.8 **Tax Matters Partner**. Steven Bradley Mell is hereby designated the Tax Matters Partner ("**TMP**") as defined in the Internal Revenue Code. The TMP shall not make any decision or take any action without the prior authorization of two-thirds of the Members in Good Standing.

2.9 **Optional IRC Elections.** The Company has the right, but not the obligation, to make any applicable elections available under the Internal Revenue Code.

2.10 **Remedies for Non-Payment of Additional Capital Contributions and other defaults**. If any Member or other equity owner (hereinafter, collectively "**Equity Owner**") fails to make full and timely payment to the Company of any additional Capital Contribution properly assessed hereunder, or if any Member defaults on any loan and such loan utilizes any asset of the Company as collateral ("**Third Party Loan**"), such failure or default shall constitute a breach of this Agreement (and any such Equity Owner shall be hereinafter referred to as a "**Defaulting Equity Owner**"). Upon such a breach and upon breach under any other agreement between Company and any Member, the Non-Defaulting Equity Owners shall promptly give notice (the "**Default Notice**") to all Equity Owners of: (a) the breach and (b) a special meeting to discuss the appropriate course of action. In the event a Defaulting Equity Owner defaults on any Third Party Loan, such Defaulting Equity Owner shall be deemed to be a Member not in good standing hereunder as of the date of such default and the Non-Defaulting Equity Owners may utilize any

4

remedies provided under this Agreement without regard to the notice provisions contained in this Section 2.10 regarding remedies. The Equity Owners who timely satisfied their obligation to make the required Additional Capital Contributions and all other obligations under this Agreement and any other agreement by and between any such Member and the Company (the **"Non-Defaulting Equity Owners"**) may, upon the affirmative vote of those Non-Defaulting Equity Owners which are Members in Good Standing holding a majority of the Membership Interests owned by all Non-Defaulting Equity Owners which are Members in Good Standing, pursue the following courses of action:

      a.    The Non-Defaulting Equity Owners shall have the option, but no obligation, to loan to the Company within sixty (60) days after the Default Notice is given (the **"Loan Decision Period"**) the amount which the Defaulting Equity Owner(s) have failed to contribute to the Company (proportionate to the ratio of the Membership Interest held by each respective Member in Good Standing electing to loan funds, to the Membership Interests held by all Members in Good Standing electing to advance funds). The amount that is loaned by any Non-Defaulting Member shall, at the election of each such Member in Good Standing (exercised by written notice to the Defaulting Equity Owner and the Company at the time the loan is made), be treated in either of the following manners:

      (1)    The loan may be treated as a loan to the Company bearing interest not less than a floating rate equal to five (5) percentage points in excess of the prime commercial lending rate in effect from time to time at the principal bank used by the Company for banking and borrowing purposes, but not exceeding the maximum rate allowable by applicable law (the **"Default Rate"**), payable from any funds paid by, or withheld by the Company from, the Defaulting Equity Owner to cure the breach, or at such other time as the Company and the lending Members in Good Standing may agree. Payments shall be credited first to accrued interest. The promissory note or other loan documentation shall contain such other terms and conditions as mutually agreed by the Company and the lending Members in Good Standing. Furthermore, the Non-Defaulting Member(s) may, but shall not be required to, allow Non-Defaulting Equity Owners to participate in making such loans.

      (2)    The loan may be treated as a loan to the Defaulting Equity Owner (specifically secured by the Defaulting Equity Owner's interest in the Company, which such secured interest may, at the option of the lending party, be further secured by recording a financing statement and/or as otherwise reasonably required by the lending party to secure such loan), followed by a contribution of the borrowed funds to the Company by the Defaulting Equity Owner curing the breach in whole or in part. Such a loan shall be payable on demand and bear interest at the Default Rate. Until the Defaulting Equity Owner's debt to any Non-Defaulting Equity Owners, together with interest thereon, is paid in full, any funds or property which would otherwise be distributed to the Defaulting Equity Owner from time to time hereunder shall be paid to such Non-Defaulting Equity Owners, according to their respective shares of loans (which are treated as loans to the

Defaulting Equity Owner). Any such payments shall be deemed to be distributions to the Defaulting Equity Owner by the Company, followed by appropriate payments by the Defaulting Equity Owner to the respective Non-Defaulting Equity Owners. Payments shall be credited first to accrued interest. Payments to Non-Defaulting Equity Owners of loans by them pursuant to either Article 2.10(a)(1) or 2.10(a)(2) herein shall be made *pari passu*.

b.    If the Non-Defaulting Equity Owners do not make loans pursuant to Article 2.10 above in the amount at least equal to the amount which the Defaulting Equity Owner failed to contribute (and the Defaulting Equity Owner has not cured said breach prior to the expiration of the Loan Decision Period), then promptly upon the expiration of the Loan Decision Period, the Non-Defaulting Equity Owners shall give notice (the **"Default Purchase Option Notice"** as more fully described below) to all of the Members. The Non-Defaulting Equity Owners shall have the option (but no obligation) for the sixty (60) day period commencing upon the date of the Default Purchase Option Notice to purchase all, but not less than all, of a Defaulting Equity Owner's Interest as provided in this Article. The option granted in this Article (the **"Default Purchase Option"**) shall be a Permitted Transfer and be exercisable in the following manner and in accordance with the following terms:

(1)    The Defaulting Purchase Option Notice shall notify the Non-Defaulting Equity Owners that they have the opportunity to purchase all, but not less than all, of the Membership Interest owned by the Defaulting Equity Owner (**"Available Membership Interest"**). Similar to Article 2.10(a)(1), the Non-Defaulting Member(s) may, but shall not be required to, allow Non-Defaulting Equity Owners to acquire a portion of such interest which, if acquired by such non-Member, shall be an equity interest and not a Membership Interest.

(2)    A Non-Defaulting Equity Owner desiring to exercise the Default Purchase Option shall so notify (the **"Exercise Notice"**) the Defaulting Equity Owner and the Company within forty-five (45) days after the date that the Default Purchase Option Notice is given.

(3)    Each Non-Defaulting Equity Owner electing to exercise the Default Purchase Option (each an **"Electing Member"** and collectively the **"Electing Members"**) shall be entitled to purchase a portion of the Available Membership Interest proportionate to the ratio of the Membership Interest held by each Electing Member to the Membership Interests held by all Electing Members electing to exercise the Default Purchase Option.

(4)    The closing for any purchase and sale of the Available Membership Interest pursuant to this Article shall take place within ninety (90) days after the date that the Default Purchase Option Notice is given. The specific time and place of closing shall be as agreed by the Electing Members and the

Defaulting Equity Owner; provided, however, that in the absence of agreement, the closing shall take place at the Company's principal office at a time reasonably set by the Company.

(5)     The price for the Defaulting Equity Owner's Ownership Interest (the **"Default Buyout Price"**) shall be equal to seventy five percent (75%) of the value of the Available Membership Interest as of the last day of the month preceding the month in which the Exercise Notice is given. For purposes of this Article the value of the Available Membership Interest shall be determined by a majority of three (3) independent appraisers, two (2) selected by the Electing Members and the third selected by the other two (2) appraisers. Such determination shall be final for purposes of this Agreement. All costs of the appraisers and the appraisal process shall be deducted from the Default Buyout Price before the Default Buyout Price is paid to the Defaulting Equity Owner.

(6)     Upon any purchase of a Defaulting Equity Owner's Membership Interest pursuant to this Article, the Default Buyout Price may be paid at closing in immediately available funds, or, in the sole discretion of each Electing Member, by delivering at closing a note issued by the Electing Member(s) as payment for the portion of the Buyout Price attributable to the portion of the Membership Interest to be purchased by the Electing Equity Owner. The notes issued as payment for the Default Buyout Price shall be negotiable promissory notes of the Company or of the Electing Equity Owner, as appropriate, bearing interest per annum at a floating rate of one (1) percentage point over the prime commercial lending rate in effect from time to time at the principal bank used by the Company for banking and borrowing purposes. Any such notes shall provide for payments of principal and interest in equal consecutive quarterly installments over a period of not more than five (5) years from the date of issuance of such note, commencing from the date of issuance of such note. Any such notes shall be prepayable without penalty, in whole or in part, with prepayments applied to the last installment or installments coming due. Such notes shall provide that if any installment of principal or interest is not paid when due or if suit is brought thereon, the maker will pay all costs of collection, including reasonable attorneys' fees.

(7)     After purchasing an Available Membership Interest, each Electing Member shall make an additional Capital Contribution to the Company in an amount equal to the proportionate share of the defaulted capital contribution attributable to the portion of the Available Membership Interest purchased by the Electing Member.

c.     If the Non-Defaulting Equity Owners do not make loans pursuant to Article 2.10 above in the amount at least equal to the amount which the Defaulting Equity Owner failed to contribute, or purchase all, but not less than all, of a Defaulting Equity Owner's

Interest pursuant to Article 2.10 above, then the Non-Defaulting Equity Owners may provide written notice to the Defaulting Equity Owners that the assets of the Company are to be sold and the Company dissolved pursuant to this Agreement. Each Member hereby acknowledges the reasonableness of the required sale and dissolution restrictions imposed by this Agreement in view of the Company purpose and the relationship of the Members. Accordingly, the required sale and dissolution restrictions imposed by this Agreement shall be strictly enforceable.

## ARTICLE 3
## MANAGEMENT: RIGHTS, POWERS AND DUTIES

3.1   **Management.**  The company shall be managed by the Member(s) who may each act independently of each other when transacting the business of the Company. The Company shall have all of the powers granted to a limited liability company as set forth in the Act, as amended from time to time.

      a.   **Officers.** The Members in Good Standing may from time to time, appoint one or more officers as they may deem advisable, but need not appoint any officers. Any officer of the Company shall hold his or her office at the pleasure of the Members in Good Standing or for such other period as the Members in Good Standing may specify at the time of his or her appointment, or until his or her death, resignation or removal by the Members in Good Standing, whichever first occurs.

      b.   **Other Agents.** The Members in Good Standing may also appoint in writing such other agents for the Company as they shall deem necessary or advisable, each of whom shall serve at the pleasure of the Members in Good Standing or for such period as the Members in Good Standing may specify, and shall exercise such powers, have such titles and perform such duties as shall be determined from time to time by the Members in Good Standing or by an officer empowered by the Members in Good Standing to make such determinations.

3.2   **Other Activities.**   The Members, officers, and their affiliates may engage in or possess interests in other business ventures of every kind and description for their own account, and in so doing shall incur no liability to the Company as a result of engaging in any other business or ventures or as a result of deriving income or profits therefrom. Neither the Members, officers, nor any of their affiliates shall be obligated to present any particular investment opportunity to the Company, even if the opportunity is of a character which, if presented to the Company, could be taken by the Company; further, any of the foregoing parties shall have the right to take for their own account or to recommend to others any investment opportunity.

3.3   **No Required Meetings.**  The Members may, but shall not be required to hold any annual, periodic or other formal meetings. Meetings of the Members may be called by any Member. The Member or Members calling the meeting may designate any place within the State of New Jersey as the place of meeting for any meeting of the Members. If no designation is made the place of meeting shall be the principal executive office of the Company. Written

notice stating the place, day and hour of the meeting and the purpose or purposes for which the meeting is called shall be delivered not less than ten (10) nor more than fifty (50) days before the date of the meeting, either personally or by mail, by or at the direction of the Member or Members calling the meeting, to each Member. If all of the Members shall meet at any time and place, either within or outside of the State of New Jersey, and consent to the holding of a meeting at such time and place, such meeting shall be valid without call or notice, and at such meeting lawful action may be taken.

3.4     **Quorum.**  Members in Good Standing holding at least two-thirds of the interests of the Company, represented in person or by proxy, shall constitute a quorum at any meeting of Members. In the absence of a quorum at any such meeting, a majority of the voting interests so represented may adjourn the meeting from time to time for a period not to exceed thirty (30) days without further notice. However, if the adjournment is for more than thirty (30) days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each Member of record. At such adjourned meeting at which a quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting as originally noticed. The Members in Good Standing present at a duly organized meeting may continue to transact business until adjournment, notwithstanding the withdrawal during such meeting of that number of Members in Good Standing whose absence would cause less than a quorum.

3.5     **Action by Members Without a Meeting.**  Action required or permitted to be taken at a meeting of Members may be taken without a meeting if the action is evidenced by one or more written consents or approvals describing the action taken and signed by Members in Good Standing. Action taken under this Article is effective when all members sufficient to form Members in Good Standing have signed the consent or approval, unless the consent specifies a different effective date. The record date for determining Members in Good Standing entitled to take action without a meeting shall be the date the first Member in Good Standing signs a written consent.

3.6     **Waiver of Notice.**  When any notice is required to be given to any Member, a waiver thereof in writing signed by the person entitled to such notice, whether before, at, or after the time stated therein, shall be equivalent to the giving of such notice.

3.7     **Indemnification.**

a.     **Indemnification of Members and Officers.**     The Company, its receiver or its trustee, shall indemnify and hold harmless the Members, officers, their affiliates, officers, directors, employees, agents, shareholders, heirs, successors and assigns (hereinafter collectively referred to, for purposes of this Article, as the "**Indemnitees**"), jointly and severally, from and against any and all losses, claims, demands, costs, damages, liabilities, joint and several, expenses of nature (including reasonable attorneys' fees and disbursements), judgments, fines, settlements and other amounts arising from any and all claims, demands, actions, suits or proceedings, whether civil, criminal, administrative or investigative, in which the Indemnitee was involved or may be involved, or threatened to be involved, as a party or otherwise, arising out of the business

or operations of the Company, regardless of whether the Indemnitee continues to be a Member, officer, an affiliate, or an officer, shareholder, director, employee, or agent of a Member at the time any such liability or expense is paid or incurred, to the fullest extent permitted by the Act and all other applicable laws.  However, no indemnification shall be provided for any person with respect to any matter as to which he or she shall be adjudicated in any proceeding not to have acted in good faith with the reasonable belief that his/her action was in the best interest of the Company.

   b.   **Expenses.**     An Indemnitee, in defending any claim, demand, action, suit or proceeding subject to this Article shall, from time to time, be advanced funds by the Company to pay the reasonable expenses of such Indemnitee, prior to the final disposition of such claim, demand, action, suit or proceeding, upon receipt by the Company of an undertaking by or on behalf of the Indemnitee to repay such amount if it shall be determined that such person or entity is not entitled to be indemnified as authorized in this Article.

   c.   **Indemnification Rights Non-Exclusive.**     The indemnification provided by this Article shall be in addition to (and not in lieu of) any other rights to which those indemnified or otherwise, both as to action in the Indemnitee's capacity as a Member, officer, as an affiliate or as an officer, director, employee, or agent, shareholders, heir, successor or assign of a Member and as to any action in another capacity, and shall continue as to an Indemnitee who has ceased to serve in such capacity and shall inure to the benefit of the heirs, successors, assigns and administrators of such Indemnitee.

## ARTICLE 4
## DISSOLUTION AND LIQUIDATION

4.1   **Dissolution.**  The Company shall dissolve and commence winding up upon the first to occur of any of the following events ("**Events of Dissolution**"):

   a.   The sale or other disposition (including, without limitation, taking by eminent domain, but excluding any like-kind exchange) of substantially all the assets and property of the Company unless such sale or other disposition involves any deferred payment of the consideration for such sale or disposition, in which case the Company shall not dissolve until the last day of the calendar year during which the Company shall receive the balance of such deferred payment;

   b.   The happening of any other event that makes it unlawful, impossible, or impractical to carry on the business of the Company or upon the entry of a decree of dissolution under the Act; or

   c.   The mutual agreement of the Members in Good Standing.

The Members hereby agree that, notwithstanding any provision of the Act, the Company shall not dissolve prior to the occurrence of an Event of Dissolution  If it is determined, by a court of competent jurisdiction, that the Company has dissolved prior to the occurrence of an Event of

Dissolution, the Members hereby agree to continue the business of the Company without a winding up or liquidation.

4.2 **Winding Up.** Upon the occurrence of an Event of Dissolution, the Company shall continue solely for the purposes of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors and Members. No Member shall take any action that is inconsistent with, or not necessary to or appropriate for, winding up the Company's business affairs. The Members in Good Standing shall be responsible for overseeing the winding up and liquidation of the Company and shall take full account of the Company's liabilities and assets and property, and the assets and property shall be liquidated as promptly as is consistent with obtaining the fair value thereof, and the proceeds therefrom, to the extent sufficient therefore, shall be applied and distributed in the following order:

    a.  To the payment and discharge of all of the Company's debts and liabilities (other than those to the Members), including the establishment of any necessary reserves;

    b.  To the payment of any debts and liabilities to the Members;

    c.  To the Members, in accordance with their positive Capital Account balances; and

    d.  Finally, to the Members in proportion with their respective Membership Interest percentages in the Company.

4.2.1 **Rights of Members.** Except as otherwise provided in this Agreement, each Member shall look solely to the assets of the Company for the return of its Capital Contribution and shall have no right or power to demand or receive property other than cash from the Company. Members in Good Standing shall have priority over any Members not in good standing as to the return of his Capital Contributions, distributions or allocations, unless otherwise provided in this Agreement.

4.2.2 **Notice of Winding Up.** If an Event of Dissolution occurs or an event occurs that would result in a dissolution of the Company, the Members shall, within thirty (30) days thereafter, provide written notice to other parties with whom the Company regularly conducts business (as determined in the discretion of the Members) and shall file a written notice of winding up pursuant to the Act.

## ARTICLE 5
## LIMITED TRANSFERABILITY OF MEMBERSHIP INTERESTS

5.1 **General.** Except as otherwise specifically provided herein, no Member shall have the right to sell, assign, exchange or otherwise transfer (whether or not such transfer is for consideration), pledge, hypothecate or grant a security interest in (collectively, "**Transfer**") its Membership Interest without the written consent of two-thirds vote of the Members in Good Standing, which may not be unreasonably withheld and any consents required by any loans,

11

leases or other financing arrangements of the Company. Each Member hereby acknowledges the reasonableness of the restrictions on Transfer of Membership Interests imposed by this Agreement in view of the Company purpose and the relationship of the Members. Accordingly, the restrictions on Transfers contained herein shall be strictly enforceable.

5.2     **Permitted Transfers.**   Subject to the conditions and restrictions set forth in this Agreement, provided no material default by Member has occurred and is continuing under this Agreement or any other agreement by and between such Member and the Company, a Member may Transfer all or any portion of its Membership Interest to one or more of the following (a **"Permitted Transfer"**):

        a.     Any other Member subject to Article 5.5 below, provided that such Member is not in default or continues to be in default pursuant to this Agreement or any other agreement by and between such Member and the Company;

        b.     Any affiliate or family member of the transferor;

        c.     In the case of a transferor which is a trust or estate, any beneficiary of such transferor trust or estate or any trust for the exclusive benefit of one or more of the beneficiaries of the transferor trust or estate or of members of any such beneficiary's spouse, natural or adoptive lineal ancestors or descendants, and trusts for his or their exclusive benefit; or

        d.     Transfers of an interest pursuant to Article 5.5 below.

Subject to the conditions and restrictions set forth in this Agreement, provided no material default by Member has occurred and is continuing under this Agreement, a Member may Transfer all or any portion of its Membership Interest to the following at any time which shall also be a Permitted Transfer:

        a.     The transferor's executor, administrator, trustee, or personal representative to whom such Membership Interest is transferred at death or involuntarily by operation of law.

5.3     **Conditions to Permitted Transfers.**   A Transfer will not be treated as a Permitted Transfer under Article 5 unless and until the following conditions are satisfied:

        a.     Except in the case of a Transfer at death or involuntarily by operation of law, the transferor and transferee will execute and deliver to the Company such documents and instruments of conveyance as may be necessary or appropriate in the opinion of counsel to the Company to effect such Transfer and to confirm the agreement of the transferee to be bound by the provisions of this Article 5. In the case of a Transfer at death or involuntarily by operation of law, the Transfer will be confirmed by presentation to the Company of legal evidence of such Transfer, in form and substance satisfactory to counsel to the Company. In all cases, the Company will be reimbursed by the transferor and/or transferee for all costs and expenses that it reasonably incurs in connection with such Transfer, including any and all accounting and other expenses incurred as a result of adjustments to basis

of the Company's assets pursuant to the Internal Revenue Code. A two-thirds vote of the Members in Good Standing may waive this condition in their discretion.

b.        Except in the case of a Transfer at death or involuntarily by operation of law, the transferor will furnish to the Company an opinion of counsel, which counsel and opinion will be satisfactory to the Company, that the Transfer will not cause the Company to terminate for federal income tax purposes and that such Transfer will not cause the application of the rules of the Internal Revenue Code generally referred to as the "tax exempt entity leasing rules" or similar rules to apply to the Company, the property of the Company, or the Members. A two-thirds vote of the Members in Good Standing may waive this condition in their discretion.

c.        The transferor and transferee will furnish the Company with the transferee's taxpayer identification number, sufficient information to determine the transferee's initial tax basis in the Membership Interest transferred, and any other information reasonably necessary to permit the Company to file all required federal and state tax returns and other legally required information statements or returns. Without limiting the generality of the foregoing, the Company is not required to make any distribution otherwise provided for in this Agreement with respect to any transferred Membership Interest until it has received such information.

d.        Except in the case of a Transfer at death or involuntarily by operation of law, either such Membership Interest will be registered under the Securities Act of 1933, as amended, and any applicable state securities laws, or the transferor will provide an opinion of counsel, which opinion and counsel will be satisfactory to the Company, to the effect that such Transfer is exempt from all applicable registration requirements and that such Transfer will not violate any applicable laws regulating the Transfer of securities. A two-thirds vote of the Members in Good Standing may waive this condition in their discretion.

e.        In order to effectuate any Permitted Transfer of a Membership Interest, the transferring Member shall require any such assignee or transferor to accept and assume in writing all of the applicable terms of this Agreement and any other applicable agreements by and between the transferring Member and the Company and the assigning Member shall send such acceptance and assumption, together with a written notice of the Transfer to all Members, promptly after consummation of the same. The remaining Members may, but shall not be obligated to join with the assigning Member and any such assignee in the execution of amendment to this Agreement admitting such assignee as a Member and, if only a portion of this assigning Member's Membership Interest is being assigned, modifying such terms hereof as are reasonably necessary to allocated, between the assigning Member and such assignee, such of the assigning Member's rights and obligations hereunder as the assigning Member wishes to allocate.

f.      Such transfer must be acceptable to two-thirds of the Members in Good Standing in terms of such transferee's creditworthiness, geographic location of flight patterns and any other factors the Members in Good Standing reasonably determine to be applicable; (ii) such transferee must be a citizen of the United States (as defined in 49 U.S.C. Section 40102(15), as amended) or otherwise eligible to register aircraft with the FAA pursuant to Part 47 of the Federal Aviation Regulations; and (iii) such transferee must execute all other documents relating to the assets and property of the Company necessary to reflect such transferee's Membership Interest, the management of the assets and property of the Company and the transferee's participation in this Agreement in order for a Transfer to be treated as a Permitted Transfer under Article 5. No such transfer will operate to relieve a Member of any liabilities accrued prior to such transfer.

5.4     **Prohibited Transfers.**

a.      Any purported Transfer of a Membership Interest that is not a Permitted Transfer will be null and void and of no force or effect whatever; provided that, if the Company is required to recognize a Transfer that is not a Permitted Transfer, the Membership Interest Transferred will be strictly limited to the transferor's rights to allocations and distributions as provided by this Agreement with respect to the transferred Membership Interest, which allocations and distributions may be applied (without limiting any other legal or equitable rights of the Company) to satisfy any debts, obligations, or liabilities for damages that the transferor or transferee of such Membership Interest may have to the Company.

b.      In the case of a Transfer or attempted Transfer of Interests that is not a Permitted Transfer, the parties engaging or attempting to engage in such Transfer hereby agrees to indemnify and hold harmless the Company and the other Members from all cost, liability, and damage that any of such indemnified persons may incur (including, without limitation, incremental tax liability and legal fees and expenses) as a result of such Transfer or attempted Transfer and efforts to enforce the indemnity granted hereby. This indemnification shall survive the expiration or termination of this Agreement.

5.5     **Right of First Refusal**

a.      If, a Member ("**Selling Member**") enters into an agreement with any person or entity pursuant to which any portion of such Member's Interest is to be assigned, purchased or otherwise Transferred ("**Offered Interest**"), and such proposed Transfer would result in the Selling Member Transferring to any one or more parties any portion of the Offered Interest, the Selling Member shall send to each of the other Members written notification ("**Notice of Transfer**") of the Selling Member's intention to so Transfer such Offered Interest. Such Notice of Transfer shall include, but not be limited to, identification of the purchaser ("**Purchasing Party**"), a copy of such agreement reflecting this right of first refusal, a statement of any and all consideration being paid in connection with such Offered Interest, the designated time, date and place of closing ("**Transfer Closing**"), a statement that the Selling Member's reasonable opinion the

14

Purchasing Party complies with Article 5.3(f) herein and all other material terms of the proposed transfer. Such Notice of Transfer shall be given to each of the Members at least sixty (60) business days prior to the Transfer Closing. After receipt of the Notice of Transfer, the other Members shall have the right, exercisable by written notice within thirty (30) business days after receipt of the Notice of Transfer and after receipt of all consents required by any loans, leases or other financing arrangements of the Company and the Selling Member, to purchase the Offered Interest to be Transferred on the same terms and conditions set forth in Notice of Transfer or on such other conditions as may be agreed-upon by the Seller Member and the other Members; provided, however (i) if more than one Member timely exercises such right of first refusal, the Members that have so exercised such right shall be entitled to purchase the Offered Interest as of the date of the proposed Transfer in proportion to their current Membership Interest at the time of the Notice of Transfer unless otherwise agreed, and (ii) if there is any non-cash consideration to be given by the Purchasing Party in connection with the Offered Interest, the Member or Members that timely exercise such right of first refusal shall pay the Selling Member, in lieu of such non-cash consideration, an amount equal to the fair market value of such non-cash consideration.

b.      If no Member(s) elect to purchase the Offered Interest pursuant to Article 5.5 herein, a majority of the remaining Members may either accept or reasonably reject the proposed Transfer of the Offered Interest to the Purchasing Party. Such acceptance or rejection shall be given to the Selling Member and all other Members in writing with any such rejection stating the reason(s) for such rejection. In the event a majority of the remaining Members do not reject in wiring to Purchasing Party's purchase of the Offered Interest within forty-five (45) days from receipt of the Notice of Transfer, then the Purchasing Party will be deemed acceptable to the remaining Members. In the event a majority of the remaining Members reject the Purchasing Party, Selling Member shall then provide written notice ("**Election Notice**") to the remaining Members that: (i) Seller Member will withdraw the Offered Interest from Transfer; or (ii) the assets of the Company are to be sold and the Company dissolved pursuant to this Agreement.

c.      Any and all costs and expenses related to the Transfer of an Offered Interest hereunder including but not limited to appraisal fees, inspections, license, filing, registration, or other fees and delivery of any assets of the Company shall be at the sole cost and expense of the Selling Member except if the assets of the Company are to be sold and the Company dissolved.

d.      If the assets of the Company are to be sold and the Company dissolved pursuant to this Agreement, and, if all Members in Good Standing are unable to agree within forty-five (45) days of the date of the Election Notice on a purchase price and terms for sale of the assets of the Company, then after the 45th day any and all aircraft and all other property, real, personal, tangible or intangible or otherwise owned by the Company shall be placed for sale in the open market in

the usual and customary manner for the value as determined in Article 5.6 below and upon their sale, the Company subsequently dissolved. If a buyer for any and all aircraft owned by the Company has not executed a letter of intent, purchase agreement, or other binding agreement for the sale and purchase of all aircraft owned by the Company for the Offered Interest Value within sixty (60) days of placing the aircraft and other property for sale in the open market, the value shall be reduced by 5% every sixty (60) days thereafter until a buyer has executed a letter of intent, purchase agreement, or other binding agreement for the sale and purchase of all aircraft owned by the Company for such revised value or until all the Members in Good Standing reach agreement on the sales price.

      e.      Any such Transfers pursuant to Article 5.5 herein shall be a Permitted Transfer.

    5.6    **Distributions and Applications in Respect to Transferred Interests**. If any Membership Interest is Transferred during any fiscal year in compliance with the provisions of Article 5, profits, losses, and all other items attributable to the Transferred Membership Interest for such fiscal year will be divided and allocated between the transferor and the transferee by taking into account their varying Membership Interests during such fiscal year in accordance with the Internal Revenue Code, using any conventions permitted by law and selected by the Company. All distributions made on or before the date of such Transfer will be made to the transferor, and all distributions after the date of Transfer will be made to the transferee. Solely for purposes of making such allocations and distributions, the Company will recognize a Transfer at the end of the calendar month during which the Transfer occurred. Neither the Company nor the Member will incur any liability for making allocations and distributions in accordance with the provisions of this Article 5.7, regardless of actual knowledge of any Transfer of ownership of any Membership Interest.

    5.7    **Additional Conditions to Recognition of Transferee**. If a Selling Member sells a Membership Interest to a person or entity who is not already a Member, as a condition to recognizing the effectiveness and binding nature of such sale, the remaining Members may require the Selling Member and the proposed successor-in-interest to execute, acknowledge and deliver to the Company such instruments of transfer, assignment and assumption and such other certificates, representations and documents, and to perform all such other acts which the Company may deem reasonably necessary or desirable to accomplish any one or more of the following: (i) confirm that the proposed successor-in-interest has accepted, assumed and agreed to be subject and bound by all of the terms, obligations and conditions of this Agreement, as the same may have been further amended; (ii) preserve the Company after the completion of such sale, under the laws of each jurisdiction in which the Company is qualified, organized or does business; (iii) maintain the current status of the Company for federal tax purposes; and (iv) assure compliance with any applicable state and federal laws, including securities laws and regulations. Any Transfer of a Membership Interest and admission of a Member performed in compliance herewith shall be deemed effective as of the last day of the calendar month in which the remaining Members' consent thereto was given. The Selling Member hereby indemnifies the Company and the remaining Members against any and all loss, damage, or expense (including, without limitation, tax liabilities or loss of tax benefits) arising directly or indirectly as a result of

any Transfer or purported Transfer in violation of this Agreement or any loans, leases or other financing arrangements of the Company.

5.8  **Additional Members**.  After the formation of the Company, any person upon the unanimous written consent of the Members in Good Standing may become a Member of the Company for such consideration as the Members in Good Standing shall determine, provided that such additional Member complies with all the requirements of a transferee under this Agreement.  No such Member shall be entitled to any retroactive allocation of losses, income or expense deductions incurred by the Company.

# ARTICLE 6
## DEATH OR INCAPACITATION OF A MEMBER

6.1  **Death or Incapacitation of a Member**.  The bankruptcy, death, incapacitation dissolution, liquidation, termination or adjudication of incompetency of a Member shall not cause the termination or dissolution of the Company and the business of the Company shall continue. Upon any such occurrence, the trustee, receiver, executor, administrator, committee, guardian or conservator of such Member shall have all the rights of such Member for the purpose of settling or managing its estate or property, subject to satisfying conditions precedent to the admission of such assignee as a substitute Member.  The transfer by such trustee, receiver, executor, administrator, committee, guardian or conservator of any Membership Interest shall be subject to all of the restrictions, hereunder to which such transfer would have been subject if such transfer had been made by such bankrupt, deceased, dissolved, liquidated, terminated or incompetent Member.  The foregoing shall apply to the extent permitted by applicable law.

Upon the bankruptcy, death, incapacitation dissolution, liquidation, termination or adjudication of incompetency of a Member, the trustee, receiver, executor, administrator, committee, guardian or conservator of such Member shall offer to the other remaining Members Membership Interest for purchase pursuant to the procedures of Article 5.5(a) herein. The Members agree that in such an event, the consideration for such Membership Interest shall be cash only and the value of the Membership Interest shall be determined by mutual agreement of the Members in Good Standing and the trustee, receiver, executor, administrator, committee, guardian or conservator of the Member and if no agreement is reached within thirty (30) days, a majority of three (3) independent appraisers, one (1) selected by the Members in Good Standing, one (1) selected by the trustee, receiver, executor, administrator, committee, guardian or conservator of such Member and the third selected by the other two (2) appraisers.  Such determination shall be final for purposes of this Agreement.  All costs of the appraisers and the appraisal process shall be deducted from the price paid for the Membership Interest before such price is paid to the trustee, receiver, executor, administrator, committee, guardian or conservator of such Member.

For purposes of this Article, a Member (if an individual) shall be considered incapacitated if the Member's attending physician and one other licensed medical physician certifies in writing on a date later than the date of this Agreement, that the Member is physically or mentally incapable of managing the Member's everyday business affairs. The Member's, whose signatures appear below,

authorizes the examining physicians for this purpose to disclose the physical and mental condition to the officers and Members for purposes of this Article.

## ARTICLE 7
## MISCELLANEOUS PROVISIONS

7.1 **Maintenance of Books and Records.** The Members shall cause complete and accurate books and records of the Company to be maintained in accordance with the Act.

7.2 **Severability.** In the event any provision or any sentence within any Section is declared by a court of competent jurisdiction to be void or unenforceable such provision or sentence shall be deemed severed from the remainder of this Agreement and the balance of this Agreement shall remain in full force and effect.

7.3 **Article and Section Headings.** The captions of the Articles and Sections in this Agreement are for convenience only and in no way define, limit, extend or describe the scope or intent of any of the provisions hereof, shall not be deemed part of this Agreement and shall not be used in construing or interpreting this Agreement.

7.4 **Governing Law.** This Agreement shall be construed according to the laws of the State of Delaware, without reference to its principles of conflict of laws.

7.5 **Pronouns and Plurals.** Whenever the context may require, any pronoun used in this Agreement shall include the corresponding masculine, feminine and neuter forms, and the singular form of nouns, pronouns and verbs shall include the plural and vice versa.

7.6 **No Third Party Beneficiaries.** There are no third party beneficiaries of this Agreement.

7.7 **Notices.** Any notice, demand, or communication required or permitted to be given by any provision of this Agreement shall be deemed to have been sufficiently given or served if sent by telecopy or facsimile transmission, delivered by messenger or overnight courier, or mailed, certified first class mail, postage prepaid, return receipt requested, and addressed or sent to the Member's address, as set forth on Schedule A, from time to time. Such notice shall be effective: (a) if delivered by messenger or by overnight courier, upon actual receipt; (b) if sent by telecopy or facsimile transmission, upon confirmation of receipt; or (c) if mailed, upon the earlier of three (3) business days after deposit in the mail and the delivery as shown by return receipt therefor. Any Member may change its address by giving notice in writing to the Company and the other Members of its new address.

7.8 **Amendments.** This Agreement may be amended only with the written agreement of the Members in Good Standing.

7.9 **Execution of Additional Instruments.** Each Member hereby agrees to execute such other and further statements of interest and holdings, designations and other instruments necessary to comply with any laws, rules or regulations.

7.10   **Waivers.** The failure of any party to seek redress for violation of or to insist upon the strict performance of any covenant or condition of this Agreement shall not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

7.11   **Rights and Remedies Cumulative.** The rights and remedies provided by this Agreement are cumulative and the use of any one right or remedy by any party shall not preclude or waive the right to use any or all other remedies. Said rights and remedies are given in addition to any other rights the parties may have by law, statute, ordinance or otherwise.

7.12   **Attorneys' Fees.** Should the Company or any party to this Agreement reasonably retain counsel for the purpose of enforcing or preventing breach of any provision of this Agreement, including but not limited to instituting any action or proceeding to enforce any provision of this Agreement, for damages by reason of any alleged breach of any provision of this Agreement, for a declaration of such party's rights or obligations under this Agreement or for any other judicial remedy, then, if the matter settled by judicial determination or arbitration, the prevailing party (whether at trial, on appeal, or arbitration) shall be entitled, in addition to such other relief as may be granted, to be reimbursed by the losing party for all costs and expenses incurred, including, but not limited to, reasonable attorneys' fees and costs for services rendered to the prevailing party.

7.13   **Heirs, Successors and Assigns.** Each and all of the covenants, terms, provisions and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Agreement, their respective heirs, legal representatives, successors and assigns.

7.14   **Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

7.15   **No Investment Representations. THE INTERESTS DESCRIBED AND REPRESENTED BY THIS LIMITED LIABILITY COMPANY AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (THE "SECURITIES ACT" OR ANY APPLICABLE STATE SECURITIES LAWS ("STATE ACTS") AND ARE RESTRICTED SECURITIES AS THAT TERM IS DEFINED IN RULE 144 UNDER THE SECURITIES ACT. THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, OR OTHERWISE TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR QUALIFICATION UNDER THE SECURITIES ACT AND APPLICABLE STATE ACTS OR PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT AND APPLICABLE STATE ACTS, THE AVAILABILITY OF WHICH IS TO BE ESTABLISHED TO THE SATISFACTION OF THE COMPANY.**

**(Signature Page to Follow)**

IN WITNESS WHEREOF, the initial Member has executed this Agreement to be effective as of the date first written above.

MEMBER:

By: _____
        Steven Bradley Mell

MEMBER:

By: _____
        Kimberly Ruggles Mell

20

<u>Schedule A</u>
<u>Members</u>

| <u>Name</u> | <u>Address, Phone, Fax</u> | <u>Percentage Interest</u> |
|---|---|---|
| 1. Steven Bradley Mell | 450 Springfield Ave.<br>Summit NJ 07901<br>Phone: 908-277-3441 | 99.00% |
| 2. Kimberly Ruggles Mell | 450 Springfield Ave.<br>Summit NJ 07901<br>Phone: 908-277-3441 | 1.00% |

**Schedule B**
**Initial Capital Contributions**

| Name | Initial Capital Contribution |
| --- | --- |
| 1.  Steven Bradley Mell | $2,500.00 |
| 2.  Kimberly Ruggles Mell | $2,417,500.00 |

# EXHIBIT L



## Creative Solutions
### Investigative Services

**CASE NAME:**       U.S. Vs. Steven B. Mell

**INVESTIGATOR:**    Daniel Coleman

**REPORT OF:**        Interview and of Alan Fournier

**DATE:**           May 22, 2018

**May 21, 2018, Monday**
**2:10 PM**

-As requested by the Bianchi Law Group, the undersigned investigator conducted an interview of Alan Fournier, 11 Hollowbrook Road, Far Hills, NJ (908)313-0119. The interview was conducted at 450 Springfield Avenue, Summit, NJ. Mr. Fournier is an acquaintance and colleague of Steven Bradley Mell. Mr. Fournier was listed a character reference on an application that Mr. Mell made to the Bedminster Police Department for an "Application for Firearms Purchaser Identification Card and/or Handgun Purchase Permit." Mr. Fournier stated that he had a conversation (via text) with Mr. Mell regarding coyotes on his (Mr. Mell's) property, and his concerns that they could harm or kill his dog "Zucc", and his need to purchase a firearm due to this threat.

Mr. Fournier showed me his cell phone and the text message exchange he had with Mr. Mell. (Images of the text message conversation are at the bottom of this report.) The conversation began on Sunday, April 29, 2018 at 7:59 PM, when they were scheduled to get together, and Mr. Mell reported that he was delayed because he (Mr. Mell), "Was chasing Zucc from coyotes." Their text conversation resumed on Monday, May 7, 2018 at 5:35 PM when Mr. Mell asked Mr. Fournier, "Hey I hope it is ok I put you down as a reference for my firearms ID card. I have some coyotes I need to deal with." Mr. Fournier inquires, "When are they around?" Mr. Mell responds, "A lot these days. Scaring me actually" Their text conversation resumed on Tuesday, May 8, 2018 at 5:16 PM. Mr. Mell writes, "Hey try to return the firearms referral when you get it if you don't mind. They say that is usually what holds things up. There are 2 coyotes that are hanging around and I think they think Zucc is one of them."

Mr. Fournier showed me his address book entry for "Brad Mell" (see image below).

2:25 PM, the interview was concluded



# Creative Solutions
## Investigative Services





# Creative Solutions
## Investigative Services



Daniel Coleman
Owner, Creative Solutions Investigative Services

# EXHIBIT M



# Creative Solutions
### Investigative Services

**CASE NAME:**        U.S. Vs. Steven B. Mell

**INVESTIGATOR:**     Daniel Coleman

**REPORT OF:**        Interview and of Diane Frederick

**DATE:**             May 22, 2018

**May 21, 2018, Monday**
**2:30 PM**

-As requested by the Bianchi Law Group, the undersigned investigator conducted an interview of Diane Frederick (908) 347-0445. The interview was conducted at 450 Springfield Avenue, Summit, NJ. Ms. Frederick is the Operations Manager at WH Mell, 450 Springfield Avenue, Summit, NJ. Ms. Frederick reported that she had a conversation with Steven Bradley Mell regarding coyotes on his property. Ms. Frederick stated that the conversation took place the first week in May, 2018, possibly Tuesday, May 1, 2018 or Wednesday May 2, 2018.  Ms. Frederick stated that the day the conversation took place, Mr. Mell called her into his office to discuss an incident that occurred on his property involving coyotes and his dog. She explained that they often discussed dogs, as Mr. Mell and Ms. Frederick both have two dogs each. She stated that Mr. Mell has a husky breed puppy named "Zuek," who is approximately 9 months to one year old, and another smaller breed dog. Ms. Frederick described the incident that Mr. Mell reported to her involving the coyotes and his dog. Mr. Mell stated that he was preparing to go to a dinner and was getting out of the shower when he looked out the window. Outside, he saw his dog Zuek sitting on the edge of the property. He was looking up at two coyotes, on a ridge on the outskirts of the property. Mr. Mell immediately got dressed, ran to the barn, grabbed a machete and chased the coyotes away. Ms. Frederick stated that there is no fence surrounding Mr. Mell's property and he was concerned about the coyotes killing his dogs.

2:50 PM, the interview was concluded

Daniel Coleman
Owner, Creative Solutions Investigative Services

# EXHIBIT N

Request for a Criminal History Record Information for a Noncriminal Justice Purposes          Page 1 of 2

State of New Jersey
Office of Forensic Science

# Request for a Criminal History Record Information for a Noncriminal Justice Purposes



## Confirmation & Receipt

Your request for a Criminal History Record Information is complete! It will be forwarded to the Local Licensing Authority entered. Please print this page for your records.

## Transaction Information

**Confirmation Number:**

8128199015

**Transaction Date:**

Tuesday, May 08, 2018 2:47:47 PM

**Amount:**

$20.00

## Requester Information

**Name:**

steven mell

**Address:**

po box 835 , far hills, NJ, 07931

**Email Address:**

sbm.wnf@gmail.com

**Reason for Filing Request:**

N.J.S 2C:58-3. Firearms Permitting/Purchase of Firearms

Request for a Criminal History Record Information for a Noncriminal Justice Purposes        Page 2 of 2

**SBI Number:**

**ORI Number:**

nj0180100 (BEDMINSTER TWP PD)

## Fingerprinting Instructions

- Log on to https://www.njportal.com/njsp/criminalrecords/ and click on the **ONLINE FORM 212A**, a highlighted block located on the lower left side of the page.

- Follow the prompts for demographic and payment information.

- Upon completion of the form you will receive an email Confirmation & Receipt that will include a confirmation number.

- At this time the request will be forwarded to the Police Department's work queue for approval and submission to the NJ State Police for processing.

- If you need more detailed information click the **Help Tab,** located on the top right side of the page.


**Bedminster ORI Number : NJ0180100**

**Bedminster Twp Police Department**
**Address History Form**
[Completion of this form is Optional]

Name of Applicant:

<u>Current Address</u>

Address: 620 BLAck Riber Rd

From 04, 08 To Present
   Month /Year   Month / Year

<u>Previous Address(s)</u>

Address: 39 Tempewick Rd

County Mendham NJ

From 06, 91 To 04, 2008
   Month /Year   Month /Year

Police Agency Having Jurisdiction At this address:

<u>Previous Address(s)</u>

Address: 1776 Beacon st

County Boston MA

From 09, 1988 To 06, 1991
   Month /Year   Month / Year

Police Agency Having Jurisdiction At this address:

<u>Previous Address(s)</u>

Address: 100 Holland Rd

County Bedminster NJ 07931

From 12, 1965 To 09, 1988
   Month /Year   Month / Year

Police Agency Having Jurisdiction At this address:

Are you at the present time or have you ever been subject to a court order pursuant to domestic violence? (y,n)

If yes, Please explain: NO

## Duplicate/Changes Application Firearms ID/Handgun Purchase Permits

*(This application packet is used by Bedminster Twp Residents only for lost/stolen, mutilated Firearms ID, Change in address, sex name and to purchase a handgun.)*

**Applications for Firearms ID Cards/Handgun Purchase Permits and Mental Health Records Search Forms** can be found on the www.NJSP.org website (Public Information Dropdown, Firearms dropdown, Forms to Download) and filled out in PDF format. **Three (3)** copies of the Application with **Three (3)** original signatures and one (1) Mental Health Records Search Form **MUST** be submitted to this agency.

### Fees

The scheduled fees to be submitted directly to the Township of Bedminster are as follows:
cash or personal check made payable to:
$2.00                                  "Township of Bedminster" (For Each Handgun Purchaser Permit)

**No Fee is charged for** Replacement ID cards or Change of Address on ID cards. The old ID Card must be turned in prior to the issuance of your new ID Card.

**If an applicant for a Permit to Purchase a Handgun** has been previously fingerprinted for a Firearms ID card, additional fingerprints are not necessary, however, they must exhibit proof such as Firearms ID card. Applicants **MUST** submit copies of **Driver's License and Firearms ID card** with applications. The applicant must log on to www.njportal.com/njsp/criminalrecords to request their Criminal History Records Information (CBI212A)

Applicant checklist:
- ☐ **Three (3)** Applications downloaded from www.njsp.org
- ☐ **One (1)** mental health records search form
- ☐ Request for Criminal History Records Information online(CBI212A form)
- ☐ Residential History Form from www.bedminster.us (OPTIONAL)
- ☐ Copy **(Front/back)** of NJ Driver's License
- ☐ Copy of Firearms ID, if applicable
- ☐ $2.00 cash or personal check made payable to: "Township of Bedminster" (For Each Handgun Purchaser Permit)

**Please note:**

In order to avoid delays in processing the applications, please provide accurate addresses (including zip codes) and phone numbers for the personal references on the application. The law requires that the personal references be US citizens. The personal references will be sent a form letter to complete. Please notify the listed references to return the questionnaires promptly. Please review all applications prior to their submittal. Unanswered or incorrectly answered questions will delay the application process.

STATE OF NEW JERSEY
## Application for Firearms Purchaser Identification Card and/or Handgun Purchase Permit

This form is prescribed by the Superintendent for use by applicants for Firearms Purchaser I.D. Cards & Handgun Purchase Permits. Any alteration to this form is expressly forbidden.

Check Appropriate Block(s)
- ☐ Initial Firearms Purchaser Identification Card
- ☐ Lost or Stolen Identification Card
- ☐ Mutilated Identification Card
- ☐ Change of Address on Identification Card
- ☐ Change of Sex on Identification Card

☐ Change of name on Identification Card
List former name and attach copy of marriage license or court order

☐ Application to Purchase a Handgun   Quantity of Permits: **2**

| (1) NAME - Last ( If female, include maiden) | First | Middle | (2) SOCIAL SECURITY NUMBER |
|---|---|---|---|
| MELL | Steven | Bradley | 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 |

| (3) RESIDENCE ADDRESS   Number & Street | City | State | Zip | (4) HOME TELEPHONE |
|---|---|---|---|---|
| 620 Black River Rd | Bedminster | NJ | 07921 | (908) 439-2141 |

| (5) DATE OF BIRTH | (6) AGE | (7) PLACE OF BIRTH   City, State, Country | (8) DRIVER'S LICENSE NUMBER & STATE |
|---|---|---|---|
| 12/5/65 | 52 | morristown NJ | M2390723621265.2 |

| (9) SEX | RACE | HEIGHT | WEIGHT | HAIR | EYES | (10) DIST. PHYSICAL CHARACTERISTICS Marks Scars Tattoos | (11) U.S. CITIZEN |
|---|---|---|---|---|---|---|---|
| M | White | 6'6" | 185 | Brown | Brown | NONE | ☒ Yes  ☐ No |

| (12) NAME OF EMPLOYER | EMPLOYER'S ADDRESS & TELEPHONE | (13) OCCUPATION |
|---|---|---|
| W.H Mell Assoc Inc 450 springield Ave Summit NJ | | Investment |

| (14) ADDRESS APPEARING ON FORMER FIREARMS PURCHASER IDENTIFICATION CARD (If Applicable) | (15) N.J. FIREARMS ID CARD/SBI NUMBER |
|---|---|
| 111 Holland Rd Bedminster NJ | |

| (16) Have you ever been convicted of any domestic violence offense in any jurisdiction which involved the elements of (1) striking, kicking, shoving, or (2) purposely or attempting to or knowingly or recklessly causing bodily injury, or (3) negligently causing bodily injury to another with a deadly weapon? If yes, explain. | ☐ Yes  ☒ No |
|---|---|

| (17) Are you subject to any court order issued pursuant to Domestic Violence? If yes, explain. | ☐ Yes  ☒ No |
|---|---|

| (18) Have you ever been adjudged a juvenile delinquent? If yes, list date(s), place(s), and offense(s). | ☐ Yes  ☒ No |
|---|---|

| (19) Have you ever been convicted of a disorderly persons offense in New Jersey or a criminal offense in another jurisdiction where you could have been sentenced up to six months in jail that has not been expunged or sealed? If yes, list date(s), place(s) and offense(s). | ☐ Yes  ☒ No |
|---|---|

| (20) Have you ever been convicted of a crime in New Jersey or a criminal offense in another jurisdiction where you could have been sentenced to more than six months in jail that has not been expunged or sealed? If yes, list date(s), place(s) and crime(s). | ☐ Yes  ☒ No |
|---|---|

| (21) Do you suffer from a physical defect or disease? | ☐ Yes  ☒ No | (22) If answer to question 21 is yes, does this make it unsafe for you to handle firearms? If not, explain. | ☐ Yes  ☐ No |
|---|---|---|---|

| (23) Are you an alcoholic? | ☐ Yes  ☒ No | (24) Have you ever been confined or committed to a mental institution or hospital for treatment or observation of a mental or psychiatric condition on a temporary, interim, or permanent basis? If yes, give the name and location of the institution or hospital and the date(s) of such confinement or commitment. | ☐ Yes  ☒ No |
|---|---|---|---|

| (25) Are you dependent upon the use of a narcotic(s) or other controlled dangerous substance(s)? | ☐ Yes  ☒ No | (26) Have you ever been attended, treated or observed by any doctor or psychiatrist or at any hospital or mental institution on an inpatient or outpatient basis for any mental or psychiatric condition? If yes, give the name and location of the doctor, psychiatrist, hospital or institution and the date(s) of such occurrence. | ☐ Yes  ☒ No |
|---|---|---|---|

| (27) Have you ever had a firearms purchaser Identification card, permit to purchase a handgun, permit to carry a handgun or any other firearms license or application refused or revoked in New Jersey or any other state? If yes, explain. | ☐ Yes  ☒ No |
|---|---|

| (28) Are you presently, or have you ever been a member of any organization which advocates or approves the commission of acts of force and violence, either to overthrow the Government of the United States or of this State, or which seeks to deny others their rights under the Constitution of either the United States or the State of New Jersey? If yes, list name and address of organization(s). | ☐ Yes  ☒ No |
|---|---|

(29) Names, Addresses and Telephone Numbers of two reputable persons who are presently acquainted with the applicant, other than relatives.

A. Evan Van Gilson 2 Rummel Rd Milford NJ 08848 908-399-7215

B. Alan Rassier 11 Hollowbrook Rd Far Hills NJ 908-313-0119

| APPLICANT: DO NOT WRITE BELOW THIS SPACE | I hereby certify that the answers given in this application are complete, true and correct in every particular. I realize that if any of the foregoing answers made by me are false, I am subject to punishment. |
|---|---|
| A non-refundable fee of $5.00 for a Firearms Purchaser Identification Card (Initial Firearms Purchaser ID card only) and/or $2.00 for each Permit to Purchase a Handgun, payable to the Superintendent of State Police or the Chief of Police in the municipality in which you reside, must accompany this application. | |

| APPROVED | IDENTIFICATION CARD/PERMIT NUMBER(S) | (30) Signature of Applicant _____   Date of Application _____ |
|---|---|---|

(The disclosure of my social security number is voluntary. Without this number, the processing of my application may be delayed. This number is considered confidential.)
Falsification of this form is a crime of the third degree as provided in NJS 2C:39-10c.

| Reason For Disapproval: | APPLICANT: DO NOT WRITE BELOW THIS SPACE |
|---|---|
| ☐ FALSIFICATION OF RECORD | |
| ☐ PUBLIC HEALTH, SAFETY AND WELFARE | This _____   Day of _____, 20___ |
| DENIED ☐ MENTAL OR PSYCHOLOGICAL OR ALCOHOLIC BACKGROUND | |
| ☐ CONVICTED OF A CRIME OR DRUG OFFENSE | |
| ☐ FALSIFICATION OF APPLICATION | Signature _____   Title _____ |
| ☐ PHYSICAL DEFICIENCY/DISABILITY | |
| GRANTED ☐ DOMESTIC VIOLENCE ISSUES | |
| ☐ COURT ORDER | Department of Police   Municipal Code # |

# EXHIBIT O



## Creative Solutions
Investigative Services

**CASE NAME:**      U.S. Vs. Steven B. Mell

**INVESTIGATOR:**    Daniel Coleman

**REPORT OF:**      Investigation at Bedminster Police Department

**DATE:**         May 23, 2018

**May 22, 2018, Tuesday**
**1:20 PM**

-As requested by the Bianchi Law Group, the undersigned investigator responded to the Bedminster Police Department, 55 Miller Lane, Bedminster, NJ, to investigate the circumstances around Steven Bradley Mell's submission of an "Application for Firearms Purchaser Identification Card and/or Handgun Purchase Permit." Mr. Mell reported that he presented the application to the female clerk at the Bedminster Police Department.

Inside the Bedminster Police Department, there was a female clerk visible through a glass partition. I spoke to her and attempted to clarify details surrounding Mr. Mell's submission of his application. The unidentified female stated that she could not discuss the matter with me and exited her area to speak to a supervisor. I was greeted by the Bedminster Township Chief of Police, Karl Rock. Chief Rock stated he was not going to permit the clerk to speak to me, and he preferred to be the point of contact for this matter. He proceeded to speak to me about Mr. Mell, his application for a replacement Firearms ID card and the coyote problem in Bedminster Township.

Chief Rock confirmed that Mr. Mell submitted an application for a "Lost or Stolen ID Card." He did not know who took Mr. Mell's application, but stated it could have been anyone at the police department, depending upon when he submitted the application. Chief Rock confirmed that it is common practice to advise applicants to submit multiple Applications to Purchase a Handgun, even if they are not going to use them. He stated, "It's more convenient. You can get up to six in one ask. Ultimately a lot of people just get them and never purchase anything."

I spoke to Chief Rock about Mr. Mell's assertion that he needed to purchase a long gun due to seeing coyote on his property. Chief Rock stated, "It's Bedminster" and that it was "coyote season." He further stated "with the amount of property he has,



**Creative Solutions**
Investigative Services

he probably could make application to fish and game to shoot wildlife on his property."

Chief Rock did not know Mr. Mell and did not know about the investigation or arrest until the day Mr. Mell was arrested.

1:35 PM, the interview was concluded

Daniel Coleman
Owner, Creative Solutions Investigative Services

# EXHIBIT P

AGREEMENT
between
S. BRADLEY MELL
and
GULFSTREAM CM, LLC
and
GULFSTREAM GP, LLC

This AGREEMENT, dated as of April 6, 2018, is entered into between S. Bradley Mell ("Mell") and Gulfstream CM, LLC, a Delaware limited liability company ("GCM"), and Gulfstream GP, LLC, a Delaware limited liability company ("GGP" and collectively with GCM, the "Gulfstream Entities").

WHEREAS, the parties wish to set forth their understanding regarding matters in connection with Mell's limited liability company interests in the Gulfstream Entities;

WHEREAS, this Agreement will serve to effectively amend the Operating Agreement of GCM, dated as of April 1, 2011 (the "GCM Agreement") and the Operating Agreement of GGP, dated as of April 1, 2011 (the "GGP Agreement" and collectively with the GCM Agreement, the "Operating Agreements");

NOW, THEREFORE, in consideration of the mutual promises and covenants herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

ARTICLE I

WITHDRAWAL

Section 1.01    Withdrawal.  The parties agree that, effective March 31, 2018 (the "Departure Date"), Mell shall be withdrawn as a Member in GCM and GGP, and thereafter, except as expressly set forth in this Agreement, shall have no membership, employment, voting, economic or other rights or interests in the Gulfstream Entities.  The Gulfstream Entities hereby waive the sixty (60) day Notice Period set forth in Section 11(a) of the Operating Agreements and accept Mell's withdrawal as of the Departure Date.

ARTICLE II

SHARE OF NET PROFITS

Section 2.01.    Net Profits for 2018.

(a)  GCM.  For calendar year 2018, Mell shall receive cash payments within (60) days after the end of such calendar year equal to (i) for the period beginning January 1, 2018 and ending March 31, 2018 (A) forty percent (40%) of the net profits of GCM attributable to any private fund client (excluding Fund Net Profits); (B) thirty-three and one-thirds percent (33 1/3%) of the net profits of GCM attributable to any client other than a private fund client; (C) forty percent (40%) of the net profits of GCM not allocated pursuant to (a)(i)(A) and (a)(i)(B) (including Net Sales Proceeds, but excluding Fund Net Profits), and (ii) for the period beginning April 1, 2018 and ending December 31, 2018 (A) twenty-four and nine-tenths percent (24.9%) of the net profits of GCM attributable to any private fund client (excluding Fund Net Profits); (B) twenty and three-fourths percent (20 3/4%) of the net profits of GCM attributable to any client other than a private fund client; (C) twenty-four and nine-tenths percent (24.9%) of the net profits of GCM not allocated pursuant to (a)(ii)(A) and (a)(ii)(B) (including Net Sales Proceeds, but excluding Fund Net Profits).

(b)  GGP.  For calendar year 2018, Mell shall receive cash payments within (60) days after the end of such calendar year equal to (i) forty percent (40%) of the net profits (including Net Sales Proceeds and any incentive allocations made to GGP with respect to a private fund client (excluding Fund Net Profits) of GGP attributable to the period beginning January 1, 2018 and ending March 31, 2018, and (ii) twenty-four and nine-tenths percent (24.9%) of the net profits (including Net Sales Proceeds and any incentive allocations made to GGP with respect to a private fund client, but excluding Fund Net Profits) attributable to the period beginning April 1, 2018 and ending December 31, 2018.

Section 2.02.    Net Profits for 2019 - 2022.

(a)  GCM.  For each of the calendar years 2019, 2020, 2021 and 2022, Mell shall receive cash payments within (60) days after the end of each such calendar year equal to (i) twenty-four and nine-tenths percent (24.9%) of the net profits of GCM attributable to any private fund client (excluding Fund Net Profits); (ii) twenty and three-fourths percent (20 3/4%) of the net profits of GCM attributable to any client other than a private fund client; and (iii) twenty-four and nine-tenths percent (24.9%) of the net profits of GCM not allocated pursuant to (a)(i) and (a)(ii) (including Net Sales Proceeds,  but excluding Fund Net Profits).

(b)  GGP.  For each of the calendar years 2019, 2020, 2021 and 2022, Mell shall receive cash payments within (60) days after the end of each such calendar year equal to twenty-four and nine-tenths percent (24.9%) of the net profits (including Net Sales Proceeds and any incentive allocations made to GGP with respect to a private fund client, but excluding Fund Net Profits) of GGP.

Section 2.03    Calculation of Net Profits.  In calculating the net profits of GCM attributable to private fund clients and any client other than private fund clients, each item of cost and expense will be allocated in accordance with the revenue associated with such cost or expense and, to the extent such item is generally associated with GCM, allocated proportionately among private fund clients and clients other than private fund clients based on aggregate revenues attributable to each.

Section 2.04.    Sunset Payments.  Mell shall not be entitled to any payments pursuant to Section 12 of the respective Operating Agreements of GCM and GGP.

Section 2.05.    Tax Treatment.  The parties agree that any payment pursuant to this Article II shall be treated as a payment to a retiring partner under Section 736(a) of the Internal Revenue Code of 1986, as amended.

ARTICLE III

PAYMENT OF CAPITAL ACCOUNT

Section 3.01    Capital Account.  Within ten (10) business days after the Departure Date, each Gulfstream Entity shall distribute to Mell, in cash, the estimated amount of Mell's Capital Account balance in such Gulfstream Entity as of the Departure Date (the "Estimated Amount").  Promptly after the auditors have completed their examination of the books of the Gulfstream Entities for the calendar year 2018, each Gulfstream Entity shall pay to Mell, in cash, the amount of the excess, if any, of the "Adjusted Capital Balance" (as defined below) over the Estimated Amount so paid, or Mell shall return and pay to the Gulfstream Entity, in cash, the amount of the excess, if any, of the Estimated Amount so paid over such Adjusted Capital Balance.  The term "Adjusted Capital Balance" in respect of a Gulfstream Entity means Mell's Capital Account in such Gulfstream Entity as of the Departure Date, increased by Mell's share of the net profits of such Gulfstream Entity for the calendar year 2018 (computed in accordance with Section 2.01 above).

ARTICLE IV

RESTRICTIVE COVENANTS

Section 4.01    Non-Solicitation.  Subject to Section 4.03, Mell agrees that, until January 1, 2023, Mell will not directly or indirectly, either as principal, agent, independent contractor, consultant, director, officer, employee, employer, advisor (whether paid or unpaid), stockholder, partner, member or in any other individual or representative capacity whatsoever, either for his own benefit or the benefit of any other person or entity, knowingly solicit, divert or take away or accept as a client or investor any person (other than a family member of Mell) who or which is a client of a Gulfstream Entity (or an affiliate of a Gulfstream Entity) or any investor in any pooled investment vehicle managed by a Gulfstream Entity (or an affiliate of a Gulfstream Entity) as of the Departure Date, or who is then being solicited as such a client or investor or was such a client or investor at any time during the one-year period ending on the Departure Date. Subject to Section 4.03, Mell further agrees that, until January 1, 2023, Mell will not, directly or indirectly, knowingly solicit or do business with any employee or member of a Gulfstream Entity (or an affiliate of a Gulfstream Entity) or former employee or member who was employed or affiliated with a Gulfstream Entity (or an affiliate of a Gulfstream Entity) at any time during the one-year period ending on the Departure Date (other than a family member of Mell).  Mell agrees that he will not make any adverse or disparaging comment regarding a Gulfstream Entity or its Managing Members.  A violation of this Section 4.01 by Mell shall result in Mell forfeiting any payments due to Mell under Article II of this Agreement; provided that the Gulfstream Entities shall provide Mell with prompt written notice upon becoming aware of any violation of this Section 4.01 in reasonable detail.  The application of the preceding sentence shall not limit a Gulfstream Entity from pursuing any other rights or remedies which it may have in law or equity.  The parties agree that this Section 4.01 shall not apply to any person or entity that is a client or employee of W. H. Mell Associates, Inc. as of the Departure Date.  For the avoidance of doubt, with respect to KRM Investments, LLC ("KRM"), this Section 4.01 does not apply to Mell or any client or employee that is a family member of Mell.

Section 4.02    Non-Competition.  Subject to Section 4.03, Mell agrees that, until January 1, 2023, Mell will not, without the prior written consent of the Gulfstream Entities, directly or indirectly, whether as principal, investor, officer, director, manager, partner, consultant, agent or otherwise, alone or in association with any other person, firm corporation or other business organization, enter into a business in direct competition with a Gulfstream Entity.  In the case where Mell is employed by an entity which is engaged in a business in direct competition (a "Competing Business") with a Gulfstream Entity or its affiliates, Mell shall be treated as violating this Section 4.02 only if Mell performs services for such Competing Business.  The Gulfstream Entities may waive in writing the provisions of this Section 4.02 in their sole discretion.  A violation of this Section 4.02 by Mell shall result in Mell forfeiting any payments due to Mell under Article II of this Agreement; provided that the Gulfstream Entities shall provide Mell with prompt written notice upon becoming aware of any violation of this Section 4.02 in reasonable detail.  The application of the preceding sentence shall not limit a Gulfstream Entity from pursuing any other rights or remedies which it may have in law or equity.  The parties agree that the business activities conducted by Mell in connection with W. H. Mell Associates, Inc. as of the Departure Date shall not be deemed a violation of this Section 4.02.  For the avoidance of doubt, this Section 4.02 is not intended to apply to KRM and its investment activities solely on behalf of Mell (or a family member of Mell), provided that such activities (including without limitation KRM's investing solely on behalf of Mell (or a family member of Mell) directly in municipal securities of the same kind held by the private fund clients of the Gulfstream Entities) are consistent with KRM's investment activities as of the Departure Date.

Section 4.03    Termination of Restrictive Covenants.  Upon at least sixty (60) business days' prior written notice from Mell to the Gulfstream Entities, Mell may elect to terminate the restrictive covenants applicable to him pursuant to Section 4.01 and Section 4.02 of this Agreement as of January 1, 2021 (the "Cessation Date").  In the event Mell makes such

3

election, Mell shall forfeit any and all payments due after the Cessation Date to Mell under Article II of this Agreement.

ARTICLE V

MISCELLANEOUS

Section 5.01    Governing Law.   This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to principles of conflicts of laws.

Section 5.02    Assignment.  This Agreement shall be binding on and shall inure to the benefit of Mell's heirs, executors, administrators, representatives and assigns and the successors in interest and assigns of the Gulfstream Entities.  Mell may not assign any of his rights hereunder, except with the written consent of the Gulfstream Entities.

Section 5.03    Release.   Mell, individually and for his agents, insurers, employees, attorneys, estates, assigns, heirs, executors, administrators and personal representatives does hereby, with the sole exception of consideration due under the terms of this Agreement and enforcement of the terms of this Agreement, unconditionally and irrevocably release and forever discharge the Gulfstream Entities, jointly and severally, and as direct third-party beneficiaries hereof, each of their partners, members, predecessors, parents, divisions, subsidiaries, affiliates, officers, directors, executives, agents, insurers, employees, attorneys, estates, purchasers, successors and assigns, of and from any and all claims of any kind, including, but not limited to actions, causes of action, rights, costs, expenses (including but not limited to attorneys' fees), compensation, debts, bonds, bills, suits, contracts, obligations, controversies, covenants, agreements, promises, judgments, executions, damages, remedies, responsibilities, liens, orders, liabilities and accounts of whatsoever kind, nature, or description, direct or indirect, in law, or in equity, including but not limited to claims for accountings, in contract or in tort or otherwise, which Mell, ever had, now has or hereafter can, shall or may have, or may hereafter assert, or which may hereafter arise against the Gulfstream Entities, jointly or severally, for or by reason of any matter or cause whatsoever, whether known or unknown, suspected or unsuspected, foreseen or unforeseen at the present time, or which may be based upon preexisting acts, claims or events occurring at any time or times up to the date hereof which may result in future claims of any kind.

Section 5.04    Indemnification.    Mell shall, to the fullest extent legally permissible under applicable law, indemnify and hold harmless the Gulfstream Entities against any and all loss, liability and expense (including, without limitation, judgments, fines, amounts paid or to be paid in settlement and reasonable attorneys' fees and expenses) ("Losses") incurred or suffered by the Gulfstream Entities arising out of any action or inaction of Mell involving personal conduct that the Gulfstream Entities reasonably deem to be outside the scope of his employment with the Gulfstream Entities).  Notwithstanding the foregoing, the aggregate amount of all Losses for which Mell shall be liable pursuant to this Section 5.04 (i) shall not exceed the aggregate amounts paid by the Gulfstream Entities to Mell under Articles II and III; (ii) shall be reduced by any insurance proceeds and any indemnity, contribution or similar payments received by the Gulfstream Entities in respect of such Losses; and (iii) shall not include Losses arising from incidental, consequential, indirect or special damages. Within thirty (30) days upon request, and to the extent legally permissible, Mell shall advance amounts and/or pay expenses as incurred by the Gulfstream Entities in connection with his indemnification obligation herein; provided, however, that if it is later finally determined that the Gulfstream Entities were not entitled to indemnification, then the Gulfstream Entities shall promptly reimburse Mell for all advanced amounts.   In the event this indemnification obligation shall be deemed to be unenforceable, whether in whole or in part, such unenforceable portion shall be stricken or modified so as to give effect to this paragraph to the fullest extent permitted by law.

4

Section 5.05   <u>Representations and Warranties</u>.   Each of the parties hereto hereby severally (and not jointly) represents and warrants that (a) such party has all right, power and authority to enter into this Agreement and perform the actions contemplated hereby, (b) this Agreement is enforceable with respect to such party in accordance with its terms, and (c) entering into this Agreement will not cause (i) a breach by such party of its obligations under any other agreement by which such party is bound, or (ii) a violation of any law, rule, regulation or court order to which such party is subject.  Each of the parties hereto hereby severally (and not jointly) agrees to indemnify and hold harmless the other parties hereto against any loss, liability, cost or expense (including reasonable attorneys' fees and expenses) which may result, directly or indirectly, from any breach of the foregoing representations and warranties.

Section 5.06   <u>Entire Agreement</u>.   This Agreement contains the entire agreement between Mell and the Gulfstream Entities and supersedes and cancels any prior agreement or understanding between the parties on the subjects covered herein and no agreements, representations or statements of any party not contained in this Agreement shall bind that party.  This Agreement can be modified, amended or waived only in writing signed by all parties.  The failure at any time to enforce any of the provisions of this Agreement shall in no way be construed as a waiver of such provisions and shall not affect the right of any party thereafter to enforce each and every provision hereof in accordance with its terms.

*[Remainder of page intentionally left blank]*

Apr 06 18, 02:13p

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

_S. Bradley Mell_

GULFSTREAM CM, LLC

By:
Name:  Ryan Posner
Title:    Managing Member

By:
Name:  Stephen Barral
Title:    Managing Member

GULFSTREAM GP, LLC

By:
Name:  Ryan Posner
Title:    Managing Member

By:
Name:  Stephen Barral
Title:    Managing Member

SK 21523 0002 7631021

6