**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

—————————————————————
:
UNITED STATES OF AMERICA,              :
:
         Plaintiff,              :
:
     v.              :              Case No. 3:18-cr-00757-BRM
:
STEVEN BRADLEY MELL,              :
:              **OPINION**
         Defendant.              :
—————————————————————:

**MARTINOTTI, DISTRICT JUDGE**

Before this Court is Defendant Steven Bradley Mell's ("Mell") Emergency Motion for Reduction of Sentence (ECF No. 63), Motion for Compassionate Release (ECF No. 78), and Supplemental Motion for Reduction of Sentence (ECF No. 96) under the First Step Act, 18 U.S.C. § 3582(c)(1)(A). Plaintiff, the United States of America (the "Government"), opposed Mell's Motion for Compassionate Release. (ECF No. 80.) Mell replied in support of his Motion for Compassionate Release. (ECF No. 84.) The Government opposed Mell's Supplemental Motion for Reduction of Sentence. (ECF No. 97.) Mell replied in support of his Supplemental Motion for Reduction of Sentence. (ECF No. 99.) The Government responded in opposition to Mell's Supplemental Motion for Reduction of Sentence. (ECF No. 104.) Mell filed a Brief in further support of his Supplemental Motion for Reduction of Sentence (ECF No. 105), and responded to the Government's response in opposition to Mell's Supplemental Motion for Reduction of Sentence (ECF Nos. 106, 108, 109). Having reviewed the parties' submissions filed in connection with the motions and having heard oral argument on December 29, 2020 (ECF No. 109), for the

reasons set forth below and for good cause having been shown, Mell's motions for compassionate release and reduction of sentence are **DENIED**.[1]

## I.   BACKGROUND

On June 17, 2019, Mell pleaded guilty to an information charging him (1) receipt of child pornography in violation of 18 U.S.C. § 2252A(a)(2), and (2) travel with intent to engage in illicit sexual conduct in violation of 18 U.S.C. § 2423(b), for his conducts occurring between May 2017 and December 2017. (ECF No. 43 at 1.) On June 18, 2019, the Court sentenced Mell to 84 months of imprisonment, followed by five years of supervised release. (ECF No. 45 at 2–3.) Mell has been incarcerated at Allenwood Low Federal Correctional Facility ("Allenwood") located in Allenwood, Pennsylvania, since his self-surrender to the Bureau of Prisons ("BOP") on July 9, 2019, and is scheduled for release on May 7, 2025. (ECF No. 80 at 4; ECF No. 96-3 at 8.) By the time of his motions, Mims had served about one year of imprisonment. (ECF No. 80 at 15; ECF No. 96-3 at 31.) Mell is now 55 years old and has no criminal history. (ECF No. 96-3 at 30; ECF No. 105 at 6.)

Mell claims to suffer from 

Since his incarceration, the BOP discontinued this medication regimen. (ECF No. 96-3 at 12.) In addition, Mell claims to suffer from

---

[1] Mell filed a habeas corpus petition, which was later withdrawn. *See Mell v. United States of America*, Case No. 3:20-cv-02277.

Based on his medical conditions, Mell filed an Emergency Motion for Reduction of Sentence (ECF No. 63) on May 1, 2020, and a Motion for Compassionate Release (ECF No. 78) on June 30, 2020. On July 9, 2020, the Government opposed Mell's Motion for Compassionate Release. (ECF No. 80.) On July 10, 2020, Mell filed a letter with expert evaluations that addressed his risk of re-offense. (ECF No. 81.) On July 21, 2020, Mell replied to the Government's opposition to his Motion for Compassionate Release. (ECF No. 84.) On August 14, 2020, Mell filed a letter to supplement his reply to the Government's opposition to his Motion for Compassionate Release. (ECF No. 91.) On October 1, 2020, Mell filed a Supplemental Motion for Reduction of Sentence. (ECF No. 96.) On October 14, 2020, the Government opposed Mell's Supplemental Motion for Reduction of Sentence. (ECF No. 97.) On October 26, 2020, Mell replied in support of his Supplemental Motion for Reduction of Sentence. (ECF No. 99.) On November 30, 2020 and December 9, 2020, Mell filed two letters in support of his Supplemental Motion for Reduction of Sentence. (ECF Nos. 100, 101.) On December 29, 2020, the parties attended an oral argument before the Court. (ECF No. 103) On January 15, 2021, the Government responded in opposition to Mell's Supplemental Motion for Reduction of Sentence (ECF No. 104), and Mell filed a Brief in further support of his Supplemental Motion for Reduction of Sentence (ECF No. 105). On January 19, 2021, Mell responded to the Government's response in opposition to Mell's Supplemental Motion for Reduction of Sentence. (ECF No. 106.)

## II.   LEGAL STANDARD

A district court may modify a sentence of imprisonment only in "limited circumstances." *See Dillon v. United States*, 560 U.S. 817, 825, 130 S. Ct. 2683, 177 L. Ed. 2d 271 (2010). One such circumstance is a compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A). The statute, as amended by the First Step Act of 2018, allows a motion for such relief to be brought by either

the Director of the BOP or by the defendant himself after the defendant has exhausted his or her administrative remedies. 18 U.S.C. § 3582(c)(1)(A)(i); *United States v. Raia*, 954 F.3d 594, 595 (3d Cir. 2020). A court may reduce the defendant's sentence if the Court finds the following: (1) there are "extraordinary and compelling reasons" which warrant a reduction; (2) the reduction would be "consistent with any applicable policy statements issued by the Sentencing Commission;" and (3) the applicable sentencing factors under 18 U.S.C. § 3553(a) indicate that reducing the defendant's sentence would be appropriate. 18 U.S.C. § 3582(c)(1)(A).

"[T]he statute itself does not define the key terms 'extraordinary and compelling,' apparently providing courts with some flexibility and discretion to consider the unique circumstances of a motion for compassionate release." *United States v. Batista*, No. 18-415, 2020 U.S. Dist. LEXIS 139068, at *4 (D.N.J. Aug. 5, 2020) (citing *United States v. Rodriguez*, 451 F. Supp. 3d 392, 397 (E.D. Pa. 2020)). The Sentencing Commission has defined the term "under the previous version of § 3582(c)(1)(A)," but it has not "updated its Policy Statement since the passage of the First Step Act." *United States v. Alexander*, No. 19-32, 2020 U.S. Dist. LEXIS 85609, at *6 (D.N.J. May 15, 2020) (citing *Rodriguez*, 451 F. Supp. 3d at 397). Nevertheless, "the present Policy Statement provides useful guidance for district courts in identifying extraordinary and compelling reasons for a defendant's eligibility for compassionate release." *United States v. Gwaltney*, No. 3:17-00381, 2020 U.S. Dist. LEXIS 186893, at *4–5 (D.N.J. Oct. 8, 2020) (citations omitted).

"The Sentencing Commission's Policy Statement provides that a defendant may demonstrate extraordinary and compelling reasons for compassionate release based on: (1) the medical condition of the defendant; (2) the age of the defendant; (3) the defendant's family circumstances; or (4) for 'other reasons.'" *United States v. Gwaltney*, 2020 U.S. Dist. LEXIS

186893, at *5 (D.N.J. Oct. 8, 2020) (citing U.S.S.G. § 1B1.13 cmt. n.1). Relevant here is "the

medical condition of the defendant," which constitutes an extraordinary and compelling reason

when:

> (i) The defendant is suffering from a terminal illness . . . ; [or]
> (ii) The defendant is—
> (I) suffering from a serious physical or medical condition,
> (II) suffering from a serious functional or cognitive impairment, or
> (III) experiencing deteriorating physical or mental health because of
> the aging process,
> that substantially diminishes the ability of the defendant to provide
> self-care within the environment of a correctional facility and from
> which he or she is not expected to recover.

U.S.S.G. § 1B1.13 cmt. n.1(A). The policy statement "allows a court to grant compassionate

release or a sentence reduction where: (i) extraordinary and compelling reasons warrant a reduction

in a defendant's sentence; (ii) the defendant is not a danger to the safety of others or to the

community; and (iii) release from custody complies with the section 3553(a) factors, to the extent

applicable." *United States v. Williams*, No. 17-0379, 2021 U.S. Dist. LEXIS 1261, at *3 (D.N.J.

Jan. 4, 2021) (citing U.S.S.G. § 1B1.13).

### III.   DECISION

As a threshold matter, the parties agreed in the oral argument that Mell satisfied the

statutory exhaustion requirement. The Court, then, turns to substance of Mell's motions.

#### A.   The Basis to Find Extraordinary and Compelling Reasons Is Not Strong

"The 'extraordinary and compelling reasons' inquiry logically has two components: (a)

identification of a medical condition that renders the defendant particularly vulnerable to serious

consequences if infected with COVID-19; and (b) the likelihood of COVID-19 infection, with

particular reference to conditions in the institution in which the defendant is incarcerated." *United

States v. Moore*, No. 19-101, 2020 U.S. Dist. LEXIS 132220 at *7 (D.N.J. July 27, 2020). The

following analysis will focus on the two components.

### 1.    Mell's Medical Conditions Alone Do Not Constitute Extraordinary and Compelling Reasons

Mell claims to suffer from a number of medical conditions that the Centers for Disease Control and Prevention ("CDC") lists as increasing the risk of serious illness from COVID-19, including ███████████████████████████████████████████████ (ECF No. 96-3 at 16.) Mell claims his ██████████████ is terminal. (*Id.* at 35.) Mell points out the United States Department of Justice ("DOJ") adopts the position that an inmate with one of the risk factors identified by the CDC should be considered as having an extraordinary and compelling reason warranting a sentence reduction. (*Id.* at 14.) Mell insists his medical conditions constitute such extraordinary and compelling reasons. (ECF No. 99 at 8.) The Government argues Mell's medical conditions are not extraordinary and compelling reasons, because they merely *might* place Mell at an increased risk for severe illness due to COVID-19. (ECF No. 97 at 2.) The Government emphasizes Mell's ███████████████████████████. (ECF No. 80 at 12.) The Court agrees.

First, Mell's ████ is not a "terminal illness" under the Sentencing Commission's policy statement. A "terminal illness" that constitutes an extraordinary and compelling reason means "a serious and advanced illness with an end of life trajectory," such as "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia." U.S.S.G. § 1B1.13 cmt. n.1(A)(i). Here, Mell has not made such a showing. Also, Mell's ████ is currently stable (ECF No. 104 at 2–3), which Mell does not dispute.

Second, as the following analysis will illustrate, Mell's medical conditions do not "substantially diminishes the ability of the defendant to provide self-care within the environment

of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13 cmt. n.1(A)(ii).

In "determining whether extraordinary and compelling reasons exist in COVID-19 compassionate release cases," courts generally defer to the CDC's list of underlying medical conditions that place "people at increased risk of severe illness from COVID-19." *United States v. Henderson*, No. 15-0329, 2020 U.S. Dist. LEXIS 156060, at *8–9 (D.N.J. Aug. 26, 2020). Courts in this District recognize the CDC's distinction between the "groups of individuals who '*are* at increased risk of severe illness' from COVID-19 and other groups who '*might* be at an increased risk of increased illness from COVID-19'" in the extraordinary and compelling reason inquiry. *United States v. Johnson*, No. 19-0787, 2021 U.S. Dist. LEXIS 9824, at *6 (D.N.J. Jan. 19, 2021) (citing *People With Certain Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Jan. 18, 2021)) (emphasis added); *see also United States v. Amos*, No. 16-0292, 2020 U.S. Dist. LEXIS 224070, at *6 (D.N.J. Nov. 30, 2020) ("[S]ignificantly, the [CDC] has placed moderate or severe asthma on its list of medical conditions that might place people of any age at increased risk for severe illness from COVID-19, as opposed to the mild or uncomplicated form. This ranking demonstrates [asthma not in a moderate or severe form] has not even been put on the list of underlying conditions that might cause, as opposed to those that cause, serious illness as a co-morbidity factor."). The medical conditions that merely "might" place individuals at an increased risk generally do not support finding extraordinary and compelling reasons. *United States v. Ogunremi*, No. 18-586, 2021 U.S. Dist. LEXIS 4969, at *6 (D.N.J. Jan. 8, 2021) (finding the defendant's obesity and hypertension, which are "medically supportable" and "might" be a risk factor for COVID-19, "are unlikely to amount to 'compelling and extraordinary reasons' that warrant release"); *United States*

*v. Huntington*, No. 19-133, 2020 U.S. Dist. LEXIS 242610, at *6–7 (D.N.J. Dec. 28, 2020) (declining to consider asthma, which "'might' present an increased risk of severe illness from the virus, as distinguished from conditions that when individuals have them, they 'are' at increased risk of serious illness from the virus" constitutes an extraordinary and compelling reason); *United States v. Coleman*, 2020 U.S. Dist. LEXIS 189069, at *13–14 (E.D. Pa. Oct. 9, 2020) (finding hypertension, which "might be at an increased risk" for COVID-19, "is not generally classified as a factor warranting compassionate release") (citations omitted).

The DOJ's internal guidance regarding compassionate release does not change the analysis. Indeed, "on May 18, 2020, the DOJ issued internal guidance which directs that the Government concede that Defendants who have certain CDC risk factors can establish that 'extraordinary and compelling reasons' warrant the reduction in sentence," including asthma (moderate to severe), liver disease (including cirrhosis), immune deficiencies, and serious heart conditions (including coronary artery disease and pulmonary hypertension). *United States v. Beard*, 2020 U.S. Dist. LEXIS 246841, at *6–7 (N.D. Ga. June 25, 2020). However, the Court does not discern, and Mell does not present, any legal authority holding the DOJ guidance binds this Court's finding of extraordinary and compelling reasons. On the contrary, the Court "is loath to make assumptions about the Government's position in any particular case," including those based on the DOJ's "apparently nationwide policy" that lists medical conditions constituting extraordinary and compelling reasons, *United States v. Edwards*, 2020 U.S. Dist. LEXIS 127869, at *20 (M.D. Tenn. June 2, 2020), and "is not bound by the DOJ's interpretation of §1B1.13 cmt. (1)(A)." *United States v. White*, 2020 U.S. Dist. LEXIS 122576, at *6 (D. Md. July 10, 2020). Moreover:

> On July 28, 2020, the DOJ issued additional guidance on two different types of COVID-19 risk factors recognized by the CDC: (1) those that definitively entail a greater risk of severe illness; and (2) those that might increase the risk of severe illness," and directed

the Government "to concede that a chronic medical condition in the first category presented an 'extraordinary and compelling' reason warranting compassionate release.

*United States v. Mangarella*, 2020 U.S. Dist. LEXIS 230495, at *7 (W.D.N.C. Dec. 7, 2020). In conclusion, the DOJ guidance does not require the Court to find a medical condition that merely *might* increase the risk for COVID-19 to constitute an extraordinary and compelling reason.

Here, Mell has proved he suffers from three medical conditions that *might* increase the risk for COVID-19, namely ███████████████████████████████████████████████ ██.[2] Mell claims to suffer from ███████ but provides no medical evidence showing his ███████ is moderate-to-severe to fall under the CDC's list of risk factors.[3] Mell also claims to suffer from █████████████████, but provides no medical evidence showing he is diagnosed with an illness.[4] In sum, nothing in the record proves Mell has a condition that *causes* an increased risk of severe illness from COVID-19. Therefore, Mell's medical conditions alone do not constitute extraordinary and compelling reasons warranting compassionate release.

---

[2] ███████ is a "liver disease" and ████████████ is an "immune deficiency" under the CDC's list of risk factors; the two illnesses, along with hypertension, *might* impose an increased risk for severe illness caused by COVID-19. *People With Certain Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Jan. 21, 2021).

[3] "[A]dults of any age with the following conditions might be at an increased risk for severe illness from the virus that causes COVID-19: ███████ (moderate-to-severe)." *People With Certain Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Jan. 20, 2021).

[4] Mell only shows he ████████████████████████████████████████ ██████ (ECF No. 96-5 at 2.) Moreover, the BOP's medical records indicate █████████ ████████████████████████████ (ECF No. 99-1 at 5.) A risk of ███████████████ is different from a diagnosis of the disease.

### 2. The Situation at Allenwood Poses a Significant Risk of COVID-19 Infection

Mell maintains the current situation at Allenwood poses a high risk of COVID-19 infection, as 360 men are housed with Mell in dormitory conditions with no separation, no social distancing, and little opportunities for handwashing. (ECF No. 78 at 6.) Mell claims he and other at-risk inmates at Allenwood have not received COVID-19 vaccinations, which have been mostly allocated to the staff at Allenwood. (ECF No. 108.) Mell contends Allenwood likely understates the severity of COVID-19 infection within its facility, because only a limited proportion of inmates have been tested for COVID-19. (ECF No. 96-3 at 17–18.) Mell states the infection rate within the BOP is much higher than the national average and, if released, he would be residing at a much safer place, i.e., an isolated 30-acre farm in New Jersey. (*Id*. at 20.) Mell also complains the BOP discontinued his ▮▮▮ treatment by ▮▮▮▮▮ (*Id*. at 39.) The Government counters the BOP has taken significant measures to protect the health of its inmates. (ECF No. 80 at 6.) With the COVID-19 Action Plan implemented and repeatedly revised, the BOP imposed social distancing measures and issued face masks within its facilities, and severely limited the movement of personnel among its facilities. (*Id*. at 6–7.)

The Government claims the BOP has taken adequate steps to monitor its inmate population for symptoms and quarantine the inmates tested positive for COVID-19, and designated selected inmates for home confinement. (*Id*. at 7.) Allenwood states its inmates have received 370 of the 700 two-dose COVID-19 vaccines that it has received in the first allotment of vaccines. (Email correspondence from Jonathan Kerr, dated February 2, 2021.) Allenwood asserts the doses will be provided to inmates based on priority of need in accordance with CDC guidelines, which indicates Mell is not at an increased risk of severe COVID-19 illness; as a result, Mell currently has not been vaccinated, but is expected be covered when the next allotment of vaccine arrives. *Id*. As for Mell's

individual situation, the Government contends Mell's health is appropriately monitored and managed by the BOP, pointing out Mell receives routine medical examinations and laboratory tests. (ECF No. 97 at 3.) The Government states Mell's recent ██████████ visit showed his ██ was stable, with no evidence of ████████████████████. (ECF No. 104 at 2–3.) The Government claims Mell is now receiving ██████████████████, based on the opinions of three medical specialists (Dr. Burns as a gastroenterologist and two primary care providers) responsible for Mell's care at the BOP. (*Id.*) The Government stresses these medical specialists are familiar with Mell's treatment history, including the use of █████, and are continuing to assess the appropriateness of █████████. (*Id.* at 2.) The Court disagrees.

In addition to the inmate's medical conditions, "a court may consider the conditions at the defendant's facility" "to determine whether compassionate release is appropriate amid the COVID-19 crisis." *United States v. Desciscio*, No. 88-cr-00239, 2020 U.S. Dist. LEXIS 121335, at \*16 (D.N.J. July 9, 2020) (citing *United States v. Catanzarite*, No 18-0362, 2020 U.S. Dist. LEXIS 94478, 2020 WL 2786927, at \*5 (D.N.J. May 29, 2020)); *see also United States v. Huntington*, No. 19-133, 2020 U.S. Dist. LEXIS 242610, at \*7 (D.N.J. Dec. 28, 2020) (ruling "the Court also considers the likelihood of the defendant contracting COVID-19 at the institution in which he is incarcerated" for the extraordinary and compelling reason inquiry). "[C]ourts have denied relief to inmates with" medical conditions presenting an increased risk for severe illness or complications from COVID-19 "if BOP is meeting their medical needs and has reasonable measures in place to prevent the spread of the virus." *United States v. Adams*, No. 3:00-cr-00697, 2020 U.S. Dist. LEXIS 190133 at \*14 (D.N.J. Oct. 14, 2020) (citations omitted); *see also United States v. Gore*, No. 10-250, 2020 U.S. Dist. LEXIS 122109, at \*12–14 (D.N.J. July 13, 2020) (finding the defendant's obesity, asthma, and other factors did not constitute "extraordinary and

compelling reasons that would justify his compassionate release," when the facility was providing adequate care).

On February 9, 2021, Allenwood had one active inmate case and zero active staff case.[5] This does not suggest a significant risk of COVID-19 infection at Allenwood. *See United States v. Mason*, 2020 U.S. Dist. LEXIS 206974, at *3 (D.N.J. Nov. 5, 2020) ("FCI Schuylkill has zero confirmed active cases of Covid-19 among inmates, but three confirmed active cases among staff at the time of this writing, suggesting the facility has been able to successfully prevent the spread of the virus among the inmate population."); *United States v. Tatar*, No. 07-459, 2020 U.S. Dist. LEXIS 205659, at *5 (D.N.J. Nov. 2, 2020) (finding three active inmate cases at the facility, which held a total of 1,070 inmates, were insufficient to show extraordinary and compelling reasons for release); *United States v. Zaffa*, No. 14-050-4, 2020 U.S. Dist. LEXIS 115308 at *7 (D.N.J. June 29, 2020) (recognizing the effectiveness of the preventive steps taken at MDC Brooklyn, which had 11 confirmed active cases); *c.f. United States v. Urzua*, No. 16-cr-312, 2020 U.S. Dist. LEXIS 240532, at *2 (D.N.J. Dec. 22, 2020) (finding "Fort Dix was experiencing an outbreak of Covid-19 among inmates and staff" when there were "17 confirmed active cases among inmates and 18 confirmed active cases among staff"); *United States v. Graham*, No. 06-cr-478, 2020 U.S. Dist. LEXIS 203939, at *6 (D.N.J. Nov. 2, 2020) (finding the risk of COVID-19 transmission was not insignificant and supported a finding of compelling and extraordinary reasons, when the prison facility has at least one active inmate case and 16 staff member active cases). However, the number of actual active cases at Allenwood could be more than one, because not all the inmates have been tested for COVID-19. As of February 9, 2021, among the 884 inmates housed at Allenwood[6], 576

---

[5] BOP, *COVID-19 Update* (last visited Feb. 9, 2021), https://www.bop.gov/coronavirus/.

[6] BOP, *FCI Allenwood Low* (last visited Feb. 9, 2021), https://www.bop.gov/locations/institutions/alf/.

(or 65.2% of the total inmate population) completed a COVID-19 test.[7] Further, Allenwood reported additional active cases not too long ago. On January 22, 2021, Allenwood had two active inmate cases and sixteen active staff cases.[8] Therefore, the risk of COVID-19 infection at Allenwood still remains, though it is possible that the conditions at Allenwood have improved recently.

As for Mell's personal well-being, the Court finds Mell has received adequate medical care at Allenwood. Though Mell is not taking ██████ nothing in the record shows ██████ is the only effective treatment of Mell's ███ or his current ███ treatment is ineffective. Instead, Mell's ███ is not significantly deteriorating. Moreover, the medical specialists at Allenwood are still considering ██████, meaning Mell could receive ██████ in the future. Mell does not challenge the adequacy of the treatments of his other medical conditions at Allenwood. Because of the adequate medical treatments Mell currently receives, and because his age and medical conditions have not caused an increased risk with COVID-19, it is reasonable for Allenwood to prioritize other more vulnerable inmates over Mell in receiving the COVID-19 vaccination, and consider Mell for vaccination when the second allotment of COVID-19 vaccines arrives.

In summary, Mell's medical conditions might increase the risk with COVID-19 and are adequately treated at Allenwood. However, Mell has three such medical conditions. Also, the current situation at Allenwood does not pose a serious risk of COVID-19 infection, but there were more active COVID-19 cases just recently. On balance, the factual basis to find extraordinary and

---

[7] BOP, *COVID-19 Update* (last visited Feb. 9, 2021), https://www.bop.gov/coronavirus/.

[8] BOP, *COVID-19 Update* (last visited Jan. 22, 2021), https://www.bop.gov/coronavirus/.

compelling reasons arguably exists, but it is weak. As a result, the Court must consider other relevant factors before making a final decision on compassionate release.

### B.   Mell Remains a Danger to the Minor Victim and the Community

The Government argues Mell presents a danger to the safety of his minor victim. (ECF No. 80 at 14.) The Government provides a list of improper conducts Mell allegedly undertook towards the minor victim and her family when the criminal investigations of Mell were ongoing, including showing up at the minor victim's job; confronting the minor victim at flight lessons; verbal threats; sending text messages to the minor victim who wanted no more contact with Mell; flying an airplane less than 50 feet above the minor victim's home; driving into the family's driveway late at night; and driving at a high speed behind the minor victim's car and causing the minor victim to pull off the road in tears. (*Id*. at 14–15.) The Government alleges Mell, during his pre-trial release, made an unauthorized visit to a pharmacy on the same road where the minor victim was employed, and suggests Mell knew the minor victim worked at that location. (*Id*. at 15.) The Government further alleges Mell, while within the confines of Allenwood, continued to harass the minor victim by (1) sending letters and faxes to her attorney and (2) publicly filing a letter on the docket that identified two minor victims, and disclosed personal and intimate details about them and their family. (ECF No. 104 at 3.) The Government contends Mell, if released, would pose a danger to the community, and refers to the minor victim's January 2021 letter that stated ███

███████████████████████████████████████████. (*Id*. at 4.)

Mell argues nearly all the above alleged events occurred prior to Mell's arrest. (ECF No. 105 at 1.) Mell points out, even after presented with Mell's unauthorized visit to a pharmacy, Judge Waldor declined to remand Mell, consented to his self-surrender, and granted a one-week extension of the surrender date. (*Id*. at 1–2; ECF No. 96-3 at 23.) Mell explains he visited the

pharmacy, which he had used for over ten years before knowing the minor victim, to pick up his medicines at a drive-through window, without getting out of his car and without knowing the minor victim worked ███████ about one mile away. (ECF No. 84 at 4.) Mell argues he did not harass the minor victim at her work, because he visited the ██████ only to deliver a lawsuit to the store owner on a dispute over Mell's daughter's puppy. (*Id*.) Mell claims he did not harass the minor victim's family by flying over their house, because he could not have flown dangerously low over the house because of the flying protocols and the surroundings of the house. (*Id*. at 2–3.) Mell insists he did not chase the minor victim on a road, for which the probation department investigated only to find no merit to the claim, and the Bedminster police, with two police cars behind Mell during the alleged incident, reported nothing occurred. (*Id*. at 4.) Mell explains he mentioned the minor victim's name in the letter filed in the docket because he thought letter would be held as confidential under the protective order, which allowed him to use the minor victim's full name. (ECF No. 105 at 2.)

Mell lists the opinions of several medical professionals that suggested he was not a danger to the victim and the community: (1) Dr. Barber found Mell's risk of recidivism was in the "below average" range and presented a low risk of harm to himself or others if released on bail; (2) Dr. Watter found, as recorded in the pre-sentencing report ("PSR"), Mell had a low risk to re-offend and was not a sex offender *per se*; (3) Dr. Krueger determined, as recorded in the PSR, Mell to be in the below average risk category for sexual recidivism, and the risk could be best managed and reduced through Mell's continuation in the community. (ECF No. 96-3 at 24–26.) Mell stresses, at Allenwood, he has not incurred a single disciplinary infraction and has taught other inmates financial literacy and, according to the BOP's own risk assessment tool, he has a "minimum" risk, with a level of -12. (*Id*. at 28.) Mell also stresses he has no criminal history. (*Id*. at 30.) Mell

maintains any risk that he might pose can be militated by the conditions of release, such as ordering Mell to move in with his mother who lives in South Carolina. (*Id.*; ECF No. 105 at 3 n.1.) Mell suggests the Government's argument of his danger is irreconcilable with the Government's own actions, including not seeking a bail upon Mell's change of plea hearing; consenting twice to modifying the conditions of Mell's bail to permit travel in the community; consented to Mell's self-surrender and extension thereto; and consenting to Mell's residing in the same neighborhood with the minor victim between December 2018 and July 2019.

The Court finds Mell remains a danger to the minor victim and the community.

"[T]o evaluate dangerousness pursuant to 18 U.S.C. § 3142(g)," a court may consider (1) "the nature and circumstances of the offense," (2) "the weight of the evidence against the person," (3) "the history and characteristics of the person," and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." *United States v. Cantatore*, No. 06-cr-478, 2020 U.S. Dist. LEXIS 89949, at *8 (D.N.J. Nov. 2, 2020) (citing 18 U.S.C. § 3142(g)). The concern that the defendant "may pose a danger to public safety if released . . . is sufficient to deny compassionate release." *United States v. Gideon*, No. 13-429, 2020 U.S. Dist. LEXIS 235208, at *8 (D.N.J. Dec. 14, 2020) (citing *United States v. Santiago*, 2020 U.S. Dist. LEXIS 124869, 2020 WL 4015245, at *4 (E.D. Pa. July 15, 2020)); *see also United States v. Mayfield*, No. 07-801, 2020 U.S. Dist. LEXIS 116391, at *7 (D.N.J. July 2, 2020) ("Guideline Section 1B1.13(2) provides that compassionate release is appropriate only where 'the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g).'").

Without deciding on all the factual disputes over Mell's actions before and after conviction, the undisputed evidence in the record is sufficient to demonstrate Mell remains a danger to the

minor victim and the community. First, the nature and circumstances of Mell's offenses, for which

he pleaded guilty, were egregious. For over half a year, Mell engaged in sexual acts with the minor

victim on various occasions, ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

███████. (ECF No. 80 at 2.) Mell requested and received multiple images and videos of child

pornography ████████████████████████████████. (*Id.* at 3.) Mell used several

methods of subterfuge to conceal his sexual exploitation of the minor victim. (*Id.*) Mell

continuously approached the minor victim even after knowing he was under criminal investigation

since December 2017. (ECF No. 52 at 12–13.) At present, Mell has only served less than two years

of his seven-year sentence[9]; his early release would substantially increase the danger posed to the

minor victim and the community. *C.f. United States v. Graham*, No. 06-cr-478, 2020 U.S. Dist.

LEXIS 203939, at *9 (D.N.J. Nov. 2, 2020) ("[B]ecause Defendant's release date is only

approximately two months away regardless of whether the Court grants Defendant's motion, it is

not clear to the Court that a reduced sentence, with supervised release, would result in any

substantial increase in the danger posed to any person or community by Defendant."); *United

States v. McCalla*, No. 11-452, 2020 U.S. Dist. LEXIS 116399, at *11 (D.N.J. July 2, 2020)

("Defendant has served more than 75% of his sentence, which demonstrates a decreased risk of

recidivism."). Second, the Court does not observe any sign of remorse from Mell's own letters,

which do not even include an apology to the minor victim and her family. (ECF Nos. 82, 83, 84,

91.) A similar lack of remorse was seen in Mell's courtroom behaviors, which included "a smirk

---

[9] The fact that Mell has served only a small portion of his sentence in itself disfavors granting him
compassionate release. A court may consider "the amount of time remaining to be served in the
inmate's sentence" in deciding whether to grant compassionate release. *United States v.
Pawlowski*, 967 F.3d 327, 330 (3d Cir. 2020) (denying a motion for compassionate release filed
by an inmate who served less than two years of his 15-year sentence).

once or twice," "rolling of the eyes," and "a deep breath," while the minor victim and her mother were testifying before Mell and the Court. (ECF No. 55 at 57.) Third, Mell once violated a condition of his 14-month pre-trial release, which required him to stay at his "residence under 24 hour lock-down except for medical necessities and court appearances, or other activities specifically approved by the court." (ECF No. 16 at 2.) Mell does not dispute his visit to a pharmacy during his bail was "unauthorized." (ECF No. 96-3 at 23.) Particularly, the visit was not "specifically approved by the court," or made out of Mell's "medical necessities," since Mell could have asked someone else to pick up his medicines. Therefore, Mell violated this condition of pre-trial release, regardless of whether the minor victim was working at a location close to the pharmacy. This calls into doubt Mell's ability to adhere to the conditions of his supervised release after an early release from Allenwood. Fourth, Mell continued to harass the minor victim while he was incarcerated at Allenwood, by publicly filing a letter (ECF No. 84) that mentioned the minor victim by name as well as the details about the minor victim and her family. Mell's explanation that he thought the letter would be kept confidential is unavailing, because Mell was represented by legal counsel, with whom Mell could have consulted before the pro se filing.

Mell cites several expert opinions for the proposition that he is not a danger, but this does not change the analysis. First, the expert opinions are outweighed by the aforementioned actions of Mell that demonstrate his dangerousness. Actions speak louder than words. Second, the Court sees no necessity of an "expert's scientific, technical, or other specialized knowledge" in determining Mell's dangerousness, which is not associated with Mell's medical conditions.[10] Fed.

---

[10] The Court notes an instance where an expert opinion was considered for the dangerousness inquiry. That is, a court-appointed independent expert assisted "in determining whether [the defendant] presented a continuing danger to himself or the community that would preclude compassionate release." *United States v. Ball*, 2020 U.S. Dist. LEXIS 140863, at *11 (C.D. Cal. Aug. 5, 2020). The expert opinion in *Ball* focused on the defendant's potential "present psychiatric

R. Evid. 702(a). Accordingly, the Court declines to admit these expert opinions for this dangerousness inquiry. *Trinidad v. Moore*, 2016 U.S. Dist. LEXIS 127868, at *12 (M.D. Ala. Sept. 20, 2016) ("To understand where admissible expert opinion in the form of a factual inference crosses the line to inadmissible legal conclusion, courts look to see if the jury is capable of drawing the conclusion itself or if technical assistance is needed.") (citations omitted); *Sarras v. United States*, 2013 U.S. Dist. LEXIS 207617, at *6 (M.D. Fla. Oct. 28, 2013) ("[T]he expert testimony was inadmissible because no specialized knowledge was needed to compare the charged images with the photographs taken of Petitioner while in custody."); *United States v. Reulet*, 2015 U.S. Dist. LEXIS 161540, at *22 (D. Kan. Dec. 2, 2015) (citing *United States v. Garcia*, 635 F.3d 472, 477 (10th Cir. 2011)) ("If the jury can understand the evidence without needing the expert's specialized knowledge, the expert testimony is inadmissible."); *Cappuccio v. Prime Capital Funding, LLC*, 2008 U.S. Dist. LEXIS 113386, at *3 n.1 (E.D. Pa. Sept. 16, 2008) ("Defendant's proffered expert testimony is unnecessary to assist the jury in reaching a verdict and it is therefore irrelevant and inadmissible under Rule 702.").

In conclusion, the Court finds Mell, if released, would pose a danger to the minor victim and the community. As the result, the Court denies Mell's motions for compassionate release and reduction of sentence.

### C.      The Court Has No Authority to Transfer Mell to Home Confinement

Mell proposes the Court should convert a part of his sentence into a period of strict home confinement, so that Mell would still serve his entire sentence, while simultaneously being able to

---

and physical condition[s]," such as "bipolar disorder" and "severe depressive symptoms," to evaluate the defendant's "suicide risk" and "probability of future drug abuse and criminal behavior." *Id*. at *12. Here, the Court never appointed an expert for this dangerousness inquiry, and Mell's medical conditions are irrelevant to his danger to the victim and the community.

seek medical care from providers who are familiar with his medical issues and equipped to treat him. (ECF No. 96-3 at 38.) Mell also suggests the Court may include a period of home confinement as a condition of his supervised release. (ECF No. 99 at 15.) The Government maintains the Court should deny Mell's request for a release to home confinement because such designation decisions are committed solely to the BOP's discretion. (ECF No. 97 at 6.) The Government argues, once a sentence is imposed, the BOP is solely responsible for determining an inmate's place of incarceration. (ECF No. 80 at 16.) The Court agrees.

A district court has no "authority to modify the sentence" by a "remedy of transfer to home confinement," and "has no general authority to dictate the place of confinement as such," because "the BOP has the first and last word" to decide on an application for transfer to home confinement. *United States v. Dunich-Kolb*, No. 14-150, 2020 U.S. Dist. LEXIS 208120, at *29 (D.N.J. Nov. 5, 2020) (citations omitted); *see also United States v. Williams*, No. 17-0379, 2021 U.S. Dist. LEXIS 1261, at *21 (D.N.J. Jan. 4, 2021) (denying the defendant's "request for the Court to 'allow him to serve the remainder of his sentence under home confinement'" because "the Court has no authority to grant such relief"); *United States v. Calabretta*, No. 12-131, 2020 U.S. Dist. LEXIS 190132, at *11 (D.N.J. Oct. 14, 2020) ("The CARES Act[11] does not empower a district court to transfer an inmate to home confinement; rather, that decision rests solely within the discretion of the BOP.") (citations omitted). A federal prisoner has no "constitutional right to service of sentence in a particular place." *Dunich-Kolb*, 2020 U.S. Dist. LEXIS 208120, at *29 (citing *Sandin v. Conner*, 515 U.S. 472, 478, 115 S. Ct. 2293, 132 L.Ed.2d 418 (1995)). "Though the Court has no authority to modify the conditions of a Defendant's imprisonment by ordering a transfer to home confinement, the Court, having already granted Defendant's motion for a reduction in his sentence,

---

[11] The Coronavirus Aid, Relief, and Economic Security Act

may impose conditions upon Defendant's supervised release, including a condition of home confinement." *United States v. Graham*, No. 06-cr-478, 2020 U.S. Dist. LEXIS 203939, at *10– 11 (D.N.J. Nov. 2, 2020) (citations omitted); *see also United States v. McCalla*, No. 11-452, 2020 U.S. Dist. LEXIS 116399, at *14 (D.N.J. July 2, 2020) (approving the defendant's "proposed release plan, under which he has agreed to be placed on home confinement" when the defendant's "request for compassionate relief is granted"). Here, since Mell's motions for compassionate release and reduction of sentence are denied, the Court is unable to grant Mell an alternative remedy of home confinement.

## IV.   CONCLUSION

For the reasons set forth above, Mell's motions for compassionate release and reduction of sentence are **DENIED** with prejudice. An appropriate order follows.

Date: Febuary 9, 2021                                    */s/ Brian R. Martinotti*
                                                        **HON. BRIAN R. MARTINOTTI**
                                                        **UNITED STATES DISTRICT JUDGE**